**UNITED STATES**

v.

**Major Orion A. RUST, 154–46–4383,
United States Air Force.**

**ACM 29629.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 10 Aug. 1991.

Decided 3 Sept. 1993.

Appellate Counsel for the Appellant: Mr. Barry P. Steinberg (argued), Colonel Jeffrey R. Owens, Colonel Terry J. Woodhouse, Major Alice M. Kottmyer, Major Mary C. Yastishock, Captain David D. Jividen, and Mr. Michael E. Reheuser.

Appellate Counsel for the United States: Colonel Jeffery T. Infelise (argued), Colonel Richard L. Purdon, and Captain David C. Wesley.

Before O'HAIR, McLAUTHLIN, and HEIMBURG, Appellate Military Judges.

## OPINION OF THE COURT

HEIMBURG, Judge:

Our original opinion in this case was unpublished (ACM 29629, 24 August 1993). That opinion is hereby withdrawn.

This general court-martial raises the issue, among others, whether "dereliction in duty" encompasses medical malpractice, the failure of a military physician to meet the appropriate "standard of care."

Major (Dr.) Rust, a board-certified obstetrician-gynecologist, was convicted by a general court-martial sitting with members of negligent dereliction in duty and making a false official statement.[1] On appeal, he asserts 15 errors affecting both findings and sentence. We find no error affecting findings and affirm, but erroneous admission of a prosecution exhibit during presentence proceedings requires us to vacate the sentence.

## THE CHARGES

Appellant was convicted of dereliction in duty in that he "willfully failed to report to the Emergency Room when required to do so, failed to personally examine [Ms. S], and failed to provide proper medical care to

[Ms. S], as it was his duty to do." He challenges the legal basis for his charges, arguing "it is against public policy to prosecute a military physician for negligence committed in the course of medical treatment." As logical support for this assertion he cites the protection against civil suit afforded military physicians by 10 U.S.C. § 1089. In addition, he cites an unwritten "custom" against criminal prosecution in the Air Force and the resulting lack of constitutionally-required notice of the criminal nature of his conduct. We are unconvinced by appellant's arguments, finding his prosecution not barred by law, custom, or lack of fundamental due process. In our view, medical malpractice by an officer whose military duties require him to provide medical care may be punished as dereliction in duty under Article 92(3), UCMJ, 10 U.S.C. § 892(3).

We begin by observing that nothing in the wording or history of Article 92, UCMJ, suggests it is an inappropriate vehicle for holding military medical professionals accountable for the proper performance of their duties. Appellant, nevertheless, points to the legislative history of 10 U.S.C. § 1089 (1988) as evidence of a legislative intent not to prosecute military physicians for simple negligence in the performance of medical duties.

10 U.S.C. § 1089, enacted in 1976, immunizes military physicians from personal liability for medical malpractice committed in the performance of their duties.[2] There is no mention of crime, criminal liability, or the Uniform Code of Military Justice in 10 U.S.C. § 1089. Since, on its face, this law does not touch on criminal responsibility, we resist appellant's invitation to

1. In violation of Articles 92 and 107, UCMJ, 10 U.S.C. §§ 892 and 907 (1988). The sentence of dismissal, a fine of $5000, and a reprimand was approved as adjudged.

2. 10 U.S.C. § 1089 provides in pertinent part: (a) The remedy against the United States provided by [the Federal Tort Claims Act] for damages for personal injury, including death, caused by the negligent or wrongful act or omission of any physician ... of the armed forces ... in the performance of medical, dental, or related health care functions ... while acting within the scope of his duties or employment therein or therefor shall hereafter be exclusive of any other civil action or proceeding by reason of the same subject matter against such physician ... whose act or omission gave rise to such action or proceeding.

examine its legislative history, as we find nothing in this enactment requiring our interpretation. Although appellant argues Congress could not have intended to immunize military physicians from civil liability but leave them liable criminally under the UCMJ for negligent medical treatment, we see nothing facially inconsistent in this state of affairs.

■ Appellant's second argument in support of his position that public policy bars his prosecution for dereliction in duty is a supposed unwritten "policy and custom" of the Air Force and other military services. He cites no authority in support of this position, only the paucity of reported cases of dereliction in duty arising out of medical malpractice. We find this argument, based on the infrequency of *reported appellate decisions*, particularly unpersuasive. In light of the relatively minor nature of the offense of dereliction in duty,[3] one may reasonably infer that most instances of minor derelictions by officers are dealt with by measures other than court-martial, but that does not detract from their status as offenses under the Uniform Code of Military Justice. *See generally* R.C.M. 306(b) and Discussion thereto; MCM, Part V, paragraph 1e (1984).[4]

■ Appellant's third public policy argument is based on *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). He argues that he was not on notice that he could be prosecuted for medical malpractice, based on the infrequency of such reported cases and fact that malpractice is not addressed in the language of Article 92 itself. *Parker v. Levy* addressed whether the "general articles," Articles 133 and 134, UCMJ, 10 U.S.C. §§ 933 and 934, were

"void for vagueness" or "overbroad" and thus violative of the due process clause of the Fifth Amendment. The opinion never questioned whether a specific punitive article of the UCMJ, such as Article 92, might be "void for vagueness" or "overbroad," and is no support for appellant's argument. As for the wording of Article 92, we readily agree with appellant it contains no mention of medical malpractice, but it mentions no other specific military duty, either. Article 92(3), UCMJ, simply provides,

> Any person subject to this chapter who—
>
> *  *  *  *  *  *
>
> (3) is derelict in the performance of his duties; shall be punished as a court-martial may direct.

The Court of Military Appeals recently upheld this simple negligence standard of criminality in the case of an officer convicted of dereliction arising from the nonperformance of military duties. *United States v. Lawson*, 36 M.J. 415 (C.M.A. 1993). We see no meaningful distinction to be drawn in this case, and find Article 92(3) was applied properly to appellant's conduct.

### ATTORNEY–CLIENT PRIVILEGE

Appellant was convicted of making a false official statement to the base claims officer that he told Ms. S he wanted to admit her to the clinic, but she refused. By early January 1991, the events of Christmas Day 1990 had become the focus of some attention, and had been reported to the base claims office as a potential medical malpractice claim. Captain C was the newly assigned base claims officer.

Captain C testified his predecessor told him of the incident involving appellant and

---

3. The maximum punishment for negligent dereliction in duty is forfeiture of two-thirds pay per month for 3 months and confinement for 3 months. MCM, Part IV, paragraph 16e(3) (1984). Officers are also liable to dismissal. R.C.M. 1003(b)(10)(A).

4. Appellant also cites a footnote in a Navy–Marine Court of Military Review decision reversing a physician's conviction of negligent homicide. *United States v. Billig*, 26 M.J. 744, 747–48 n. 1 (N.M.C.M.R.1988). This footnote observed one reason the case was heard *en banc*

was the assignment of error that "[i]t is against public policy to prosecute military medical personnel for negligent homicide committed in the course of medical treatment." The footnote questioned such prosecutions under Article 134, UCMJ, on a "due process" notice basis, citing *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). Apart from the fact the footnote was *dicta* in *Billig*, it is also arguably irrelevant to a prosecution for dereliction in duty under Article 92, UCMJ.

suggested investigation was required. On 3 January 1991, Captain C was at the clinic to pick up some medical records unrelated to this case. The clinic patient affairs administrator suggested Captain C should meet appellant, and took him to appellant's office for an introduction. Captain C told appellant he "was the hospital's lawyer" whose job was to investigate potential claims under the Federal Tort Claims Act.

He went on to describe the process of investigation and reports through legal and medical channels which would be involved. He and appellant discussed the events of 25 December. Appellant offered Captain C a statement he had previously written out, saying "he had been writing it all down so he could refresh his memory." Captain C photocopied the statement and returned it to appellant. As he learned more about the case in the next weeks, Captain C began to be concerned about the truthfulness of some matters in appellant's statement and turned the statement over to military investigators.

■ Appellant asserts all statements he made to Captain C are subject to attorney-client privilege, and were used against him in violation of Mil.R.Evid. 502. Whether such privilege protects appellant's statements depends on whether appellant's encounter with Captain C on 3 January 1991 created an attorney-client relationship. Mil.R.Evid. 502(b)(1) defines "client" for the purposes of the privilege as "a person ... who receives professional legal services from a lawyer, or who consults a lawyer with a view to obtaining professional legal services from the lawyer." The test to be applied is subjective from the point of view of the person claiming to be a client, but that person's belief that a lawyer-client relationship has been created must be reasonable. *United States v. Henson*, 20 M.J. 620, 622 (A.C.M.R.1985); Mil.R.Evid. 502(b)(2).

■ The trial judge made findings on this issue which we believe are fully supported by the evidence. He found that Captain C "clearly indicated to the accused that he was the claims officer conducting an investigation and that he represented the United States," and he "revealed the purpose of his investigation and the persons to whom it would be revealed" and "made no representations to the accused that he represented him." Accordingly, the trial judge found, and we concur, that appellant had "no reasonable basis ... to have concluded that Captain C represented him" and no attorney-client relationship existed. This assertion by appellant is without merit.

## LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE

Appellant asserts the evidence in the record is insufficient, legally and factually, to sustain the findings of guilty. The standards for our review of legal and factual sufficiency of the evidence are set forth in *United States v. Turner*, 25 M.J. 324 (C.M.A.1987):

> The test for the former is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of Military Review are themselves convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987).

Appellant was the on-call obstetrician-gynecologist at the Castle AFB clinic on 24 and 25 December 1990. Ms. S, a military dependent estranged from her husband, came to the Castle AFB clinic the evening of 24 December 1990. About 23–24 weeks pregnant, she complained of upper respiratory tract symptoms, vaginal bleeding, and that she felt as if the baby's head were "coming out." The emergency room physician, Dr. C, consulted appellant by telephone and gave Ms. S appellant's advice: get bed rest, meet her regular OB/GYN

appointment, come back for an ultrasound, and if bleeding recurs, come back.

Ms. S came back Christmas night, again seeing Dr. C. She complained of cramping and spotting, and told the physician she "felt" something in her vaginal opening. After examining her, Dr. C called appellant. The telephone conversation which ensued is the focus of both the dereliction and false official statement charges.

Dr. C testified he described Ms. S's symptoms to appellant, opined an ultrasound was needed to know where the placenta was, and suggested admission. Appellant told him there was nothing to be done, because the fetus wasn't viable. When he learned appellant didn't want to admit Ms. S, Dr. C told appellant he wasn't "comfortable" about the patient. Appellant told Dr. C he would speak with Ms. S, and Dr. C brought Ms. S to the telephone, where she spoke with appellant out of Dr. C's hearing. When they finished, Ms. S told Dr. C appellant said he would see her the next day. She then went home with her mother.

Mrs. B, Ms. S's mother, testified she accompanied Ms. S to the Castle AFB clinic both times. Ms. S told her on 25 December she wanted a "sonogram" or to be admitted to the hospital. Mrs. B did not overhear any of the telephone conversation Ms. S had with appellant, but she observed her daughter through a window as she talked. She testified Ms. S became visibly upset during the telephone conversation and began crying. After they left the clinic, Ms. S complained that "the doctor" would neither come to the clinic to see her nor admit her. Ms. S said "the doctor" told her, "Don't worry; I'll do all your worrying for you."

After Ms. S and her mother arrived home, Ms. S continued to believe something bad was happening to her, and telephoned the local civilian hospital, speaking with an obstetrical nurse. The nurse testified she tried to convince Ms. S to go back to Castle AFB, but Ms. S wanted to come to the civilian hospital, and the nurse agreed. Once Ms. S arrived, the emergency room staff called Dr. C for information about what he had done. Events happened rapidly thereafter: Ms. S began to show definite signs of premature labor. The civilian hospital was no more capable of handling such an extremely premature delivery than the Castle AFB clinic, and, after beginning intravenous medication to stop labor, sent Ms. S by ambulance to a medical center in Fresno. There, all efforts to prevent delivery failed. The baby was born early 27 December 1990 and died the next day. Ms. S was killed by RA, her lover, in a murder-suicide on 29 or 30 December 1990.

Appellant's version of his telephone conversation with Ms. S differed significantly from that presented in the testimony of Mrs. B and corroborated by the civilian hospital nurse. His statement to Captain C, which he repeated at trial, was that he told Ms. S he wanted to admit her to the clinic for bed rest and observation, but she refused to be admitted.

## A. DERELICTION IN DUTY

■ Appellant asserts his conviction of dereliction in duty must fall because of insufficient evidence that he violated any standard of care concerning Ms. S. Specifically, he argues: the prosecution established no duty to come to the clinic and admit Ms. S; experts testified he met the standard of care; and, any breach in the standard of care must lie with Dr. C, who was the initial care provider treating Ms. S.

We find no merit in any of appellant's arguments. The uniform testimony of the medical experts, including appellant, was that an obstetrician-gynecologist who assumed responsibility for a patient in Ms. S's condition was required either to come to the clinic and personally care for her or ensure that another qualified professional provide such care. His only relief from this duty was if the patient refused treatment. Appellant testified Ms. S would not wait at the clinic for him to come and examine her and, when he asked her to put Dr. C on the telephone so Dr. C could have her sign an "AMA" (against medical advice) form, they were disconnected. The crucial question thus presented to the mem-

bers was not whether a standard of care required appellant to personally attend Ms. S, but appellant's credibility when he testified he tried to meet that standard. The court members' findings of guilt indicate their disbelief of appellant's story. We find the evidence sufficient legally and factually to support their findings of guilt.

## B. FALSE OFFICIAL STATEMENT

■ Appellant asserts the evidence is legally insufficient to sustain this conviction on two grounds: the statement he gave Captain C was an incomplete rough draft never adopted by him as a complete or accurate account of the events; and, the rough draft was not material and could not have influenced any official actions of the Air Force. We find against appellant on both grounds. At the time appellant gave Captain C the notes, he knew an official investigation was to be conducted into the incident and that his actions on 25 December 1990 had been questioned. He knew the standard of care by which his actions would be judged, and that the only basis on which he could avoid liability was patient refusal of care. From the evidence, a reasonable factfinder may infer appellant's statement to Captain C was given for the purpose of influencing the outcome of the potential malpractice investigation. Since his testimony at trial was substantially in accord with the contents of the rough draft charged as false, appellant's claim the account was incomplete and not adopted as accurate is not credible. We find the evidence legally sufficient to support appellant's conviction of making a false official statement.

The evidence also is factually sufficient to support appellant's conviction. Having weighed the evidence, we are convinced beyond a reasonable doubt that appellant willfully communicated a false statement, knowing the statement was false and material to Captain C's investigation.

## TRIAL COUNSEL MISCONDUCT

Appellant alleges the trial counsel's improper conduct denied him a fair trial. Appellant alleges trial counsel withheld exculpatory evidence (a pathology report on Ms. S's fetus); misrepresented the availability of a potential defense expert witness and thereby ensured the witness would be denied when the defense finally requested the judge to order his appearance; and, throughout the pendency of the trial, exhibited an improper "win at any cost" attitude in violation of the applicable ethical standards. We find no merit in any of appellant's contentions.

■ Trial counsel answered "none" in response to defense pretrial discovery requests for "medical records ... (including those for "Baby Boy [S]")...." and for "[t]he autopsy or pathology report for the placenta." Appellant does not assert trial counsel's representations were false, but that trial counsel should have been able to subpoena "five pathology slides of [Ms. S's] fetus" because appellant obtained them post-trial, using the services of an independent civilian physician. Whether considered as a *Brady*[5] denial of due process issue or under the discovery rule of R.C.M. 701(a)(2), we find no prosecutorial misconduct. Assuming the defense discovery requests were sufficiently specific and that trial counsel had an obligation to attempt to obtain the slides by subpoena, we conclude appellant was not prejudiced by trial counsel's actions. Such evidence was not exculpatory, for it affected no element of the offense of dereliction with which appellant was charged. Neither was it impeachment or rebuttal information. At most, appellant asserts the slides would have convinced the government's expert that "nothing could have been done to prevent [Ms. S's] early delivery." This evidence may have had some materiality in sentencing, but failure of trial counsel to obtain it does not rise to the level of prosecutorial misconduct.

■ Appellant next complains trial counsel acted intentionally to ensure Dr. W, an expert in obstetrics and gynecology, was denied to the defense. He did so, appellant complains, by first assuring the defense he

5. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

would call Dr. W as a witness, then telling Dr. W to go on leave because he was unneeded, and, finally, opposing a defense motion to produce Dr. W by "false and misleading" statements to the court. We have carefully examined the record and find no "false and misleading" statements by trial counsel during litigation of the defense request for Dr. W at trial. There is, further, no evidence the defense requested Dr. W before trial counsel told Dr. W he was free to go on leave, and we are not persuaded trial counsel assured defense counsel Dr. W would be present at trial.

Appellant's final assertion of prosecutorial misconduct is that trial counsel had a "win at any cost" attitude which permeated the entire trial and deprived him of the right to a fair trial. Our examination of the record shows a lengthy, hotly contested trial, but no evidence of overzealousness or a "win at any cost" mentality on the part of the prosecutor. In sum, we do not find evidence of prosecutorial misconduct in this case.

## INEFFECTIVE ASSISTANCE OF COUNSEL

■ Closely allied with his claim of prosecutorial misconduct is appellant's claim that his trial defense counsel were ineffective "as a matter of law." In order to prevail on a claim of ineffective assistance of counsel, appellant must establish both ineffectiveness and prejudice. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Scott,* 24 M.J. 186 (C.M.A.1987).

■ Appellant argues his claim of ineffectiveness on four bases. First is failure to locate or interview Ms. S's husband, who would have testified she hated military medical care, thus corroborating appellant's testimony about the telephone conversation with Ms. S on 25 December. The remainder are: court member instructions proposed by the defense which were "legally defective" because they used the simple negligence standard of civil liability; agreement to a stipulation of fact about the death of Ms. S; and, failing to call appellant to testify about the attorney-client relationship with Captain C.

Affidavits of trial defense counsel, rebutted by affidavits of appellant, defend the alleged failures as valid tactical decisions. As noted above, the trial was lengthy, taking most of 6 days. Appellant's trial defense counsel vigorously and extensively litigated many of the issues raised on appeal and several others, winning acquittal of one specification of false official statement and a finding of guilt of a lesser offense of the willful dereliction charged. Considering the state of the law and the evidence at trial, we are not convinced appellant's trial defense counsel fell short of the standards expected of counsel in any material respect. Finding no ineffectiveness, we reject this asserted error.

## DENIAL OF DEFENSE EXPERT WITNESS

Prior to entering pleas, trial defense counsel moved to compel the production of Major (Dr.) W as an expert witness. Trial counsel opposed the motion as untimely and argued the testimony of Major W would be cumulative with that of Colonel (Dr.) T, an expert witness previously granted the defense. The military judge ruled the defense motion "only marginally" timely, but denied it because Major W's testimony would be cumulative with that of Colonel T.

Appellant asserts the judge abused his discretion in denying the defense Major W. His arguments are the same as at trial: Major W's testimony was noncumulative because, although both he and Colonel T reached the same opinion on the standard of care concerning Ms. S, Major W approached the issues from a materially different vantage point. Colonel T had performed the "medical incident investigation" for quality assurance and risk management purposes, while Major W was called on to do a "peer review" of appellant's work. Another significant factor, appellant argues, is that Colonel T was subject to impeachment for bias due to a previous prose-

cutorial action against him (no such cross-examination occurred at trial).

■■■■■ Military defendants have the right to compelled attendance of witnesses whose testimony is relevant and necessary. Article 46, UCMJ, 10 U.S.C. § 846; R.C.M. 703(b)(1). A trial judge's ruling denying personal attendance of a witness is reviewed for abuse of discretion. *United States v. Tangpuz*, 5 M.J. 426, 428 (C.M.A. 1978). As we review the trial judge's decision, we observe that the concept of "cumulative" testimony involves the exercise of judgment as to the weight to be accorded different witnesses. Rarely would two eyewitnesses to an alleged crime be considered cumulative. Here, however, the witnesses were not eyewitnesses; they were experts who had no personal knowledge of the events at issue, but could only give an opinion interpreting the actions of others. In this circumstance, we are unwilling to find abuse of discretion by the trial judge.

## THE "SUICIDE" NOTE

Over vehement defense objection, the trial judge admitted Prosecution Exhibit 18 in the presentencing hearing as evidence in aggravation of the offense of dereliction in duty. *See* R.C.M. 1001(a)(1)(A)(iv). Prosecution Exhibit 18 is a stained, handwritten letter by RA, the putative father of Ms. S's child and her apparent murderer. The letter began, "She was hurting so bad because the baby died. She wanted to be with it and so did I." It continues about how much "we loved each other," but faced "rejection.... misery and unhappiness," apparently from RA's and Ms. S's families.

Appellant argues there is no nexus between appellant's conduct and the deaths of Ms. S and RA, so Prosecution Exhibit 18 is not admissible as "aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty." R.C.M. 1001(b)(4). We agree.

■■■■■ Victim impact evidence is admissible as evidence in aggravation, but must "directly relate to or result from the accused's offense"—in this case, appel-

lant's negligent dereliction. *United States v. Gordon*, 31 M.J. 30, 36 (C.M.A.1990). One may posit that appellant's dereliction led to the death of Ms. S's baby, a consequence in some dispute at trial, and that the baby's death gave Ms. S and RA great sorrow. In that sense, the murder-suicide which followed may "relate to" appellant's negligent conduct in some logical fashion. In another sense, however, which we find more persuasive, the deaths of Ms. S and RA were the independent result of RA's disturbed mind.

The standard for admission of evidence under R.C.M. 1001(b)(4) is "not the mere relevance of the purported aggravating circumstance to the offense." *Gordon*, 31 M.J. at 36. Instead, this rule requires that the evidence somehow be a consequence of the offense or relate directly to it. Prosecution Exhibit 18 fails to meet that test. The deaths of Ms. S and RA did not "directly relate to or result from" appellant's dereliction in duty. Moreover, Prosecution Exhibit 18 fails the test of Mil.R.Evid. 403, in that its probative value is far outweighed by the danger of unfair prejudice.

Having concluded the Prosecution Exhibit 18 was erroneously admitted, we must assess the impact. We cannot say with any degree of certainty what sentence the court would have adjudged absent this highly inflammatory exhibit. *United States v. Peoples*, 29 M.J. 426, 428 (C.M.A. 1990); *United States v. Sales*, 22 M.J. 305 (C.M.A.1986). A rehearing is required.

## CONCLUSION

Appellant has raised a number of other issues. We have examined each carefully, along with arguments of counsel, and conclude they are without merit.

The approved findings of guilty are affirmed. The sentence is set aside. A rehearing may be ordered by the same or a different convening authority. If a rehearing is deemed impractical, a sentence of "no punishment" may be approved.

Senior Judges O'HAIR and McLAUTHLIN, who participated in this decision prior to their departure from the Court, concur.