UNITED STATES, Appellant
and Cross–Appellee

v.

Orion A. RUST, Major, U.S. Air Force,
Appellee and Cross–Appellant.

No. 94–5001.
CMR No. 29629.

U.S. Court of Appeals for
the Armed Forces.

Argued Jan. 10, 1995.

Decided April 6, 1995.

For the Accused: *Barry P. Steinberg* (argued); *Michael E. Reheuser, Colonel Jay L. Cohen, Captain Eric N. Eklund* (on brief).

For the United States: *Colonel Jeffery T. Infelise* (argued); *Captain Jules D. Silberberg* (on brief); *Colonel Thomas E. Schlegel.*

*Opinion of the Court*

GIERKE, Judge:

1.  A general court-martial convicted Major Rust, contrary to his pleas, of dereliction of duty and making a false official statement, in violation of Articles 92 and 107, Uniform Code of Military Justice, 10 USC §§ 892 and 907, respectively. The approved sentence provides for a dismissal, a $5000.00 fine, and a reprimand. The Court of Military Review [1] affirmed the findings of guilty but set aside the sentence. 38 MJ 726 (1993). The Judge Advocate General of the Air Force certified the following questions to this Court for review:

I

WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED WHEN IT HELD THAT PROSECUTION EXHIBIT 18, THE MURDER–

---

1.  *See* 41 MJ 213, 229 n. * (1994).

SUICIDE NOTE OF MR. [A], WAS ERRONEOUSLY ADMITTED DURING THE PRESENTENCING HEARING AS EVIDENCE IN AGGRAVATION OF THE OFFENSE OF DERELICTION IN DUTY.

## II

WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED WHEN IT FAILED TO FIND THAT ANY ERROR IN ADMITTING PROSECUTION EXHIBIT 18 WAS HARMLESS.

2. We granted review of the following issues raised in the cross-petition:

## I

WHETHER THE MILITARY JUDGE ERRED IN ADMITTING THE TESTIMONY OF CAPTAIN CARRANZA AND PROSECUTION EXHIBIT 5, WRITTEN NOTES PROVIDED BY [MAJ RUST] TO HIS COUNSEL, AS VIOLATIVE OF [MAJ RUST]'S PRIVILEGE IN ATTORNEY–CLIENT MATTERS.

## II

WHETHER [MAJ RUST]'S ORAL STATEMENTS AND WRITTEN NOTES TO CAPTAIN CARRANZA WERE PART OF A QUALITY ASSURANCE INVESTIGATION AND THEREFORE INADMISSIBLE.

## III

WHETHER [MAJ RUST] WAS DENIED A FAIR TRIAL BY VIRTUE OF THE TRIAL COUNSEL'S IMPROPER CONDUCT.

## IV

WHETHER THE MILITARY JUDGE ERRED, TO THE PREJUDICE OF [MAJ RUST], BY ADMITTING PROSECUTION EXHIBIT 18, THE MURDER SUICIDE NOTE OF MR. [A], OVER DEFENSE OBJECTION.

*Factual Background*

3. Mrs. S, the pregnant spouse of an Army enlisted member, went to the emergency room of the Castle Air Force Base, California, hospital on December 24, 1990, suffering from vaginal bleeding. She said that she "felt" as if her baby's head was "coming out of her ... vagina." She was examined by Dr. Manuel Canga, a contract physician. Dr. Canga called Maj Rust, the on-call obstetrician, and described Mrs. S's symptoms. Dr. Canga testified that Maj Rust advised him to have Mrs. S return home, get bed rest, and return to the hospital if she had any other complaints.

4. Mrs. S returned on the evening of the next day, December 25, and again saw Dr. Canga. He again called Maj Rust and described Mrs. S's complaints. Maj Rust asked to speak with Mrs. S on the telephone. What was said over the telephone was disputed at trial. Mrs. S's mother testified that Mrs. S was upset after the telephone conversation because appellant would not come to the hospital to examine her and admit her. Maj Rust testified that he told Mrs. S to remain at the hospital so that he could come to the hospital and admit her but that Mrs. S refused to be admitted and left the hospital. The charge of dereliction of duty was based on Maj Rust's alleged failure to come to the hospital, examine Mrs. S, and admit her.

5. Mrs. S left Castle Air Force Base hospital and returned home. She then went to a local civilian hospital, where she was diagnosed as being in premature labor. Because the local hospital was not equipped to handle a premature birth, Mrs. S was transferred to Valley Medical Center in Fresno, California, where she gave birth to a premature baby boy, who died on December 28.

6. On December 29 or 30, Robert A, Mrs. S's lover and the father of the premature baby, strangled Mrs. S to death and then committed suicide by shooting himself. A suicide note was found with their bodies. The note reads as follows:

12–29–90

She was hurting so bad because the baby died. She wanted to be with it and so did

I. We are going to be with the ones we love in the name of Jesus Christ we die for him. And no longer will we be a burden on our parents or society. We loved each other very much But nobody really cared to help us or love us as we were. The time has come to go home to God. Who will accept us as we are and Knows what is in our hearts. We wanted peace love and fellowship but we could and did not know how to cope with all the rejection that followed. We do not wish to be *embalmed* we want to be remembered as two people who loved each other so much that we wanted to be together in eternity. Time will past and the hurt you feel will cary on. But ask yourself what was so wrong that we found misery and unhappiness at every turn. She wanted to die. She told me so. She asked me to help her. And I did what she wanted. She and I love our parents very much but we grew to be a burden on them both. We wanted peace and acceptance from everyone involved but they would not let it be. So as time goes on you will see that what really matters is love and love alone. The baby died and he, John Christopher [A], My only child and it hurt us very deeply in the depth of our souls. How can we express the sorrow of what we've done. It will weigh heavily on the hearts we left behind. But, only burden and misery followed us wherever and whenever we lived. Now I ask for you Salvator [A] and Teesa [A], James [B] and Jayne [B] to forgive and pray for us. For we truly loved one another and if you both (family's) could have seen and recognize that maybe things could have been different. To Jesus Christ we three give our spirit.

God love you all, pray for us and the baby.

It is accomplished.

[Unsigned]

7. The suicide note was received in evidence over defense objection during the sentencing hearing. The Court of Military Review held that the military judge erred by admitting the suicide note. 38 MJ at 734. This holding is the basis of the two certified issues and granted Issue IV.

8. On December 26, Dr. Canga mentioned Mrs. S's case to Colonel (Col) Ortaliz, Chief of Hospital Services, Castle AFB Hospital, opining that "Dr. Rust should have come and seen the patient." As Chief of Hospital Services, Col Ortaliz was responsible for risk management and quality assurance. On December 26th "or on a later date," Col Ortaliz asked Maj Rust about Mrs. S. He testified that he did not suspect Maj Rust of a criminal offense. Col Ortaliz testified that Maj Rust told him that "he wanted the patient to get admitted but the patient refused admission." The military judge admitted Maj Rust's oral statement to Col Ortaliz over defense objection. Before this Court, Maj Rust has not contested admission of his statement to Col Ortaliz.

9. Lieutenant Colonel (Lt Col) Pohl, the hospital commander, testified that in early January 1991, he received a telephone call from the Vice Wing Commander, advising him of a "potential risk management issue." He reviewed the emergency room records for December 24 and 25 and became concerned about inadequate documentation of Mrs. S's treatment. Lt Col Pohl testified that he did not suspect Maj Rust of a criminal offense, but only suspected "that we had poor documentation of the incident."

10. Lt Col Pohl discussed the treatment of Mrs. S with Maj Rust on January 3. He asked Maj Rust "to tell me his account of what had happened and he did so." He testified that Maj Rust told him that he had "attempted to convince" Mrs. S "to come in to the hospital," that he was unsuccessful, and that "he made arrangements with her verbally to come in the following morning to be seen in the clinic and to have an ultrasound done of the pelvis." Lt Col Pohl testified that he suggested to Maj Rust "[t]hat it would be certainly appropriate for him to make sure that his documentation was done to cover his involvement in this case." The military judge suppressed evidence of Maj Rust's oral statements to Lt Col Pohl, on the ground that Lt Col Pohl should have treated Major Rust as a suspect and advised him of

his rights under Article 31, UCMJ, 10 USC § 831.

11. Captain (Capt) Carranza, the Castle Air Force Base claims officer, testified that his predecessor had advised him during the last week of December that there had been an "incident at the hospital on the 24th and 25th of December involving [PS] and that I should get on the case since [his predecessor] was leaving." On January 3, 1991, Capt Carranza was at the hospital picking up medical records for an unrelated case when the patient affairs administrator suggested that he introduce himself to Maj Rust. The purpose of the introduction was "so he knew who I was and what we did and how the Air Force took care of these things." In response to direct examination by trial counsel, Capt Carranza described his conversation with Maj Rust as follows:

I told him my name, told him where I worked, told him that I was basically the hospital's lawyer, that my job was to investigate the potential claims under the Federal Tort Claims Act.

* * *

... I told him how the whole process worked, basically that I gather the information and I write the report and that will go to the medical law consultant at Travis. He would send all the information that I sent to him—he'd consult with experts in the field at the medical center up at Travis, write his own report, and then everything would go to Headquarters Air Force for their determination as to whether to settle or not settle or—like that.

12. When trial counsel asked Capt Carranza if he told Maj Rust that his claims investigation would be disclosed to other Air Force officials, Capt Carranza responded:

Yes. I did that for one reason. Just because—a lot of the things that—we understand that the doctors—so that they know that there are other doctors looking at this stuff. It is not a bunch of lawyers [deciding] whether they did something or not.

13. At the time of his conversation with Maj Rust, Capt Carranza "had not reviewed the medical records." He testified that he did not advise Maj Rust of his rights because "[i]t was not a criminal matter at all." He did not approach Maj Rust to discuss Mrs. S's case, but merely to introduce himself. When the military judge asked Capt Carranza if he intended "to conduct any interview of Dr. Rust at all," Capt Carranza responded, "I was completely ill-prepared to conduct an interview, sir. I just wanted to tell him who I was so he would know my face when I came around again."

14. Capt Carranza testified that when he entered Maj Rust's office, Maj Rust had a handwritten statement in his hands. He told Capt Carranza that "he had been writing it all down so he could refresh his memory so he would not forget." Capt Carranza testified that Maj Rust told him "that he had been very rattled by the whole thing." When Maj Rust said that "[h]e had never been involved in a case where someone had died," Capt Carranza "told him that really was not part of the claims investigation at all and that I did not think he had really anything to do with that part of it. It really just happened after his involvement ended."

15. Maj Rust then read the statement to Capt Carranza and later gave him a copy. Capt Carranza could not remember whether he asked for a copy or Maj Rust just volunteered it.

16. On cross-examination, Capt Carranza testified that he told Maj Rust that he "would be investigating" any "medical malpractice claim" and that, if Maj Rust were sued individually, he and the United States attorney would work to have Maj Rust "removed individually" from the lawsuit. Capt Carranza testified that he explained to Maj Rust that "the way it usually happened would be that the U.S. attorney would move to have him dismissed and the United States substituted for him and that we would help him get the paperwork together." Although Capt Carranza did "not think" he "used the words 'best interest,'" he admitted that his summarized testimony at the Article 32, UCMJ, 10 USC § 832, investigation reflected that "I did tell him that I would be working in his best interest and that of the United States."

Capt Carranza did not expressly tell Maj Rust that he was not his lawyer.

17. In the handwritten statement, Maj Rust wrote that he had given Airman Kieborz instructions regarding Mrs. S. Near the end of January, Capt Carranza talked to Airman Kieborz, who said that she had "never talked" to Maj Rust about Mrs. S. Airman Kieborz was concerned because Maj Rust "had approached her and told her that he was trying to get all his ducks in line." Capt Carranza went to the staff judge advocate (SJA) for guidance because "[i]t just seemed weird to me." The SJA advised Capt Carranza to "turn the matter over to Capt Lindemann," the chief of military justice at the base. Capt Carranza gave his copy of Maj Rust's statement to the Office of Special Investigations (OSI) in March, at their request. The military judge denied a defense request to suppress Maj Rust's oral and written statements to Capt Carranza. Granted Issues I and II of Maj Rust's cross-petition challenge this ruling.

18. On March 15, 1991, Maj Carey L. Winkler, M.D., Director of Obstetrical Services, Maternal Fetal Medicine, David Grant Medical Center, Travis Air Force Base, California, conducted a "Peer Review" of Mrs. S's treatment. Although Maj Winkler did not testify at the Article 32 investigation, he was interviewed by the defense as a possible witness. The defense did not formally request Maj Winkler as a witness until August 1, four days before the trial began, apparently because they thought Maj Winkler probably would be a prosecution witness. Trial counsel opposed the request for Maj Winkler, who was on leave when the court-martial commenced. The military judge denied the defense request to compel the attendance of Maj Winkler or to continue the trial until Maj Winkler's return from leave, on the ground that his testimony would be cumulative. Appellant now contends, in Granted Issue III, see Final Brief on Cross–Petition at 32, that the defense was deprived of Maj Winkler's testimony due to trial counsel's misconduct.

19. On April 29, 1991, defense counsel made a pretrial discovery request which included "[a]ny and all medical records from the Valley Children's Hospital, Fresno, California (including those for "Baby Boy [S]")." Trial counsel responded, "The medical records of [Mrs. S] have been provided. Please let us know if there is something you feel is missing." Defense counsel submitted an additional discovery request on July 31, 1991, requesting "[t]he autopsy or pathology report for the *placenta.*" On August 1, 1991, trial counsel responded: "None" to this request.

20. After the trial, the defense discovered that there were five pathology slides from the deceased premature baby at the Valley Medical Center. Lt Col Bruce Banias, M.D., who had testified as an expert witness for the prosecution, submitted a post-trial affidavit after examining the slides, opining that nothing could have prevented the premature birth of Mrs. S's baby. The defense now asserts, in Granted Issue III, that trial counsel's failure to disclose the exculpatory slides was at least "merely negligent" and perhaps "a deliberate falsehood." *See* Final Brief on Cross–Petition at 29.

21. Maj Rust also asserts that trial counsel was overzealous and that his " 'win at any cost' attitude permeated the case and was specifically commented upon by other witnesses." Final Brief on Cross–Petition at 38. He submitted two post-trial affidavits in support of this assertion.

22. The first affidavit is from the same Maj Winkler whose unavailability at trial is attributed by Maj Rust to prosecutorial misconduct. Maj Winkler quotes trial counsel as saying to him, "I think Dr. Rust is a bad doctor and I am out to get him."

23. A second affidavit, from Colonel J. Eric Christman, M.D., recites the following:

[a] The Air Force prosecutor seemed to be carrying a vendetta against Dr. Rust. He intimidated my staff and seemed to depart from a fact finding mission into a demonstration of power. The prosecutor's approach was a threatening attitude rather than a request for cooperation.

[b] When speaking of Dr. Rust, the Air Force prosecutor said something to the

effect that "this guy's going to spend time in Leavenworth if I can help it."

24. The defense did not raise the issue of trial counsel's personal bias at the court-martial. The issue was raised before the Court of Military Review, which found "no evidence of overzealousness or a 'win at any cost' mentality on the part of the prosecutor." 38 MJ at 733.

### Discussion

I. Admission of the Murder–Suicide Note

(Certified Issues I and II,
Granted Issue IV).

■ 25. RCM 1001(b)(4), Manual for Courts–Martial, United States, 1984, permits trial counsel to "present evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty." Such evidence "may include evidence of financial, social, psychological, and medical impact on or cost to any person or entity who was the victim of an offense committed by the accused." RCM 1001(b)(4), Discussion.

26. The defense argues that Maj Rust's dereliction was not the cause of Mr. A's deranged and criminal acts. The defense further argues that any probative value of the evidence is substantially outweighed by its inflammatory nature. Answer to Final Brief on Certified Issues at 17. The Government argues that RCM 1001(b)(4) is satisfied if Maj Rust's acts can reasonably be shown to have contributed to the murder-suicide. Final Brief on Certified Issues at 16–18.

■ 27. The phrase "directly relating to or resulting from the offenses" imposes a "higher standard" than "mere relevance." *United States v. Gordon*, 31 MJ 30, 36 (CMA 1990). Evidence is admissible on sentence which shows "the specific harm caused by the defendant." *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991). Nevertheless, an accused is not "responsible for a never-ending chain of causes and effects." *United States*

*v. Witt*, 21 MJ 637, 640 n. 3 (ACMR 1985), *pet. denied*, 22 MJ 347 (1986). Evidence qualifying for admission under RCM 1001(b)(4) must also pass the test of Mil. R.Evid. 403, Manual, *supra; see United States v. Wilson*, 35 MJ 473, 476 n. 5 (CMA 1992). A "military judge has wide discretion" in applying Mil.R.Evid. 403. *United States v. Yanke*, 23 MJ 144, 145 (CMA 1987).

28. Applying the foregoing principles, we hold that the Court of Military Review did not err in holding that the military judge abused his discretion by admitting the murder-suicide note. The Court of Military Review's finding of fact concerning causation, *i.e.*, that the murder-suicide was "the independent result of [Mr. A's] disturbed mind," is amply supported by the record. *See* 38 MJ at 734.

29. Furthermore, even assuming *arguendo* that Mr. A's criminal acts were logically connected to the crime, the connection is too indirect to satisfy the requirement of RCM 1001(b)(4) that the consequences be "directly relating to or resulting from" Maj Rust's dereliction of duty. Finally, we agree with the court below that any such connection is too tenuous when balanced against the prejudicial impact of indicating that Maj Rust caused three deaths. 38 MJ at 374. *See* Mil.R.Evid. 403. Accordingly, we hold that the court below did not err, and we answer the first certified question in the negative.[2]

■ 30. Like the court below, "We cannot say with any degree of certainty what sentence the court would have adjudged absent this highly inflammatory exhibit." 38 MJ at 734. Accordingly, we hold that the court below did not err by failing to find the error harmless, and we answer the second certified question in the negative.

II. Admission of Maj Rust's Notes

A. Lawyer-Client Privilege
(Granted Issue I)

■ 31. Maj Rust contends that his handwritten notes are protected by the law-

---

2. If, as represented by Maj Rust with respect to Granted Issue III, there is evidence that the premature birth of the baby was inevitable, then

the murder-suicide is even more tenuously related to Maj Rust's dereliction of duty.

yer-client privilege. He asserts that Capt Carranza led him to believe that he was his lawyer and that anything Maj Rust told him would be kept in confidence. Final Brief on Granted Issues at 4. The military judge ruled that Maj Rust had no reasonable basis to believe that he and Capt Carranza had formed a lawyer-client relationship. We hold that the military judge's finding that there was no lawyer-client relationship is supported by the record and not clearly erroneous.

32. Mil.R.Evid. 502(a) provides: "A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client. . . ." Mil. R.Evid. 502(b)(1) defines a "client" as "a person, public officer, corporation, association, organization, or other entity, either public or private, who receives professional legal services from a lawyer, or who consults a lawyer with a view to obtaining professional legal services from the lawyer." Mil.R.Evid. 502(b)(4) provides: "A communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication."

■■■ 33. "The party invoking the attorney-client privilege has the burden of proving that" the lawyer-client "relationship existed and that the communications" in question "were confidential." *United States v. Schaltenbrand,* 930 F.2d 1554, 1562 (11th Cir. 1991). To be protected by the privilege, the communication must be made to the lawyer "confidentially, in his professional capacity, for the purpose of securing legal advice or

assistance." *Id., quoting United States v. Ponder,* 475 F.2d 37, 39 (5th Cir.1973). The pivotal question is "whether the client reasonably understood the conference to be confidential." 930 F.2d at 1562, *quoting Kevlik v. Goldstein,* 724 F.2d 844, 849 (1st Cir.1984) (quoting McCormick on Evidence, § 91 at 189 (1972)).

■■■ 34. Whether a lawyer-client relationship existed when a communication to a lawyer was made is a question of fact. *United States v. Gandy,* 9 USCMA 355, 361, 26 CMR 135, 141, 1958 WL 3321 (1958); *United States v. Costanzo,* 740 F.2d 251, 254 (3d Cir.1984). In determining whether the lawyer-client privilege protects the communication in question, the military judge should resolve any doubt "in favor of the accused." *United States v. Gandy, supra.* Once made, the military judge's determination should be upheld on appeal unless clearly erroneous. *United States v. Costanzo, supra* at 254.

■■■ 35. We hold that the military judge's finding was not clearly erroneous. Since Maj Rust did not testify on the motion to suppress, the military judge did not have direct evidence of Maj Rust's subjective beliefs regarding his relationship with Capt Carranza.[3] However, the military judge did not turn his ruling on Maj Rust's subjective beliefs but rather on the reasonableness of such beliefs. In this regard, the record reflects that Capt Carranza introduced himself as a lawyer for the hospital who was conducting a claims investigation. Maj Rust did not seek out Capt Carranza, ask him for advice, or receive any advice. Capt Carranza informed Maj Rust that his investigative file, including any information obtained from Maj Rust, would be disclosed to a "medical law consultant" and other technical experts, and

3. We decline to consider Maj Rust's post-trial affidavit as evidence of his subjective beliefs. Maj Rust had an opportunity to testify on the motion to suppress but did not. We will not permit him to relitigate the motion by means of an *ex parte* affidavit offered for the first time on appeal. We are required to review the military judge's ruling on the admissibility of the evidence "on the basis of the evidence in the record of trial." *United States v. Penn,* 18 USCMA 194, 197, 39 CMR 194, 197 (1969). *See United States v. Vangelisti,* 30 MJ 234, 237 (CMA 1990) ("[T]he pertinent inquiry is the legal sufficiency of evidence *of record* supporting the judge's finding, not the existence of evidence—or of potential evidence—supporting a contrary holding."). *Cf. United States v. Bethea,* 22 USCMA 223, 225, 46 CMR 223, 225 (1973) ("[F]actual determinations germane to a finding on the merits should be based on evidence that has been exposed to cross-examination or the right to cross-examine.").

then forwarded to "Headquarters Air Force." Accordingly, we conclude that the record supports the military judge's finding that there was no reasonable basis for Maj Rust to have concluded that he was providing confidential information to his lawyer.

### B. Medical Quality Assurance Records (Granted Issue II)

■ 36. Maj Rust also contends that his statements were protected by federal statute as part of the medical quality assurance program. Final Brief on Granted Issues at 23. The Government argues that Capt Carranza was not conducting a quality assurance inquiry when he spoke with Maj Rust. Answer to Final Brief on Granted Issues at 16. The Government argues further that even if Maj Rust's statements were obtained as part of a medical quality assurance inquiry, the statute authorizes disclosure in a criminal proceeding. *Id.* at 17. We hold that the military judge did not abuse his discretion by ruling that Maj Rust's statements were not protected by the medical quality assurance statute.

37. Generally, medical quality assurance records "are confidential and privileged." 10 USC § 1102(a). Such records may be disclosed, however, "[t]o a criminal or civil law enforcement agency or instrumentality charged under applicable law with the protection of the public health or safety," and may be used "[i]n an administrative or judicial proceeding commenced by a criminal or civil law enforcement agency." 10 USC § 1102(c)(1)(F)–(G). The military judge found that Capt Carranza was not conducting a medical quality assurance inquiry during his meeting with Maj Rust. Furthermore, the military judge ruled that, even if Capt Carranza had been conducting a medical quality assurance inquiry, the statute did not protect Maj Rust's statements from disclosure in a court-martial. We hold that the military judge's finding is supported by the record and that his legal conclusion regarding the scope of any confidentiality afforded by the statute was correct.

### III. Prosecutorial Misconduct

### (Granted Issue III)

38. Our resolution of the certified issues moots the question whether trial counsel was guilty of misconduct by failing to disclose the evidence derived from the autopsy of the deceased baby or by causing the unavailability of the expert witness. Both sources of evidence were relevant only to sentencing. Maj Rust's dereliction of duty was completed when he failed to examine Mrs. S or admit her to the hospital. Since our resolution of the certified questions requires a sentence rehearing, the consequences of his dereliction may be litigated at that rehearing. The defense is now aware of the autopsy evidence and will be able to obtain and use such evidence if the Government attempts to show that Maj Rust was responsible for the baby's death. Likewise, the defense will have another opportunity to obtain expert testimony.

■ 39. Finally, we reject the defense assertion that trial counsel's "win at any cost" attitude requires that the findings be set aside. Although the asserted prosecutorial misconduct occurred prior to trial, the defense did not move to disqualify trial counsel. *See* RCM 502(d)(4) and (f). Accordingly, any issue whether trial counsel was so determined to convict and punish Maj Rust that he became an "accuser" (*see* Art. 1(9), UCMJ, 10 USC § 801(9)) was waived. RCM 905(e). To the extent that the affidavits demonstrate an aggressive, perhaps abrasive, attitude, there is no showing that trial counsel's attitude or conduct improperly affected the findings. *Cf. Wright v. United States,* 2 MJ 9 (CMA 1976) (defective appointment of trial counsel not jurisdictional; procedural defect must be tested for prejudice). The impact on sentencing is mooted for the reasons set out above.

### *Decision*

40. The certified questions are answered in the negative. Granted Issues I and II are resolved against Maj Rust. Granted Issue III is mooted by our disposition of the certified questions and Granted Issue IV. Granted Issue IV is resolved in Maj Rust's favor.

The decision of the United States Air Force Court of Military Review setting aside the sentence is affirmed.

Judges COX, CRAWFORD, and WISS concur.

SULLIVAN, Chief Judge (concurring):

41. Appellant was tried by a general court-martial composed of officer members in August of 1991. Those officers found that appellant was derelict in his duties in violation of Article 92, Uniform Code of Military Justice, 10 USC § 892, based on the following allegations:

SPECIFICATION: In that [the accused], who should have known his duties as the on-call physician in Obstetrics and Gynecology for the 93d Strategic Hospital, at or near Castle Air Force Base, California, on or about 25 December 1990, was derelict in the performance of his duties in that he negligently failed to report to the Emergency Room when required to do so, failed to personally examine [Mrs. S], and failed to provide proper medical care to [Mrs. S], as it was his duty to do.

42. This is another example where an officer's conduct in the military can be a crime, but in the civilian world his conduct would not be a crime. *See United States v. Lawson,* 36 MJ 415 (CMA 1993).