UNITED STATES, Appellee,

v.

Thaddeus D. GORDON, III, Private,
U.S. Army, Appellant.

No. 63,367.
CM 8802219.

U.S. Court of Military Appeals.

Argued March 14, 1990.

Decided Sept. 6, 1990.

Lieutenant Colonel Daniel J. Dell'Orto, Major Martin D. Carpenter, Captain Karen L. Taylor (USAR) (on brief).

## Opinion of the Court

SULLIVAN, Judge:

On September 20 and 26, 1988, appellant was tried by a general court-martial composed of officer and enlisted members at Kaiserslautern, Federal Republic of Germany. Contrary to his pleas, he was found guilty of negligent homicide,[1] in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. He was sentenced to a bad-conduct discharge, confinement and forfeiture of $447.00 pay per month for 6 months, and reduction to the lowest enlisted grade. The convening authority approved the sentence as adjudged, but he suspended execution of the bad-conduct discharge and confinement in excess of 3 months. The suspension was for a period of 1 year with provision for automatic remission of this portion of the sentence if not vacated before the end of this period. The Court of Military Review affirmed the findings and sentence in a short-form opinion dated July 20, 1989.

This Court granted review of the following issues:

### I

WHETHER THE EVIDENCE IS SUFFICIENT TO CONVICT APPELLANT WHERE APPELLANT'S CONDUCT DID NOT PROXIMATELY CAUSE THE VICTIM'S DEATH.

### II

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJ-

For Appellant: *Captain Pamela J. Dominisse* (argued); *Lieutenant Colonel Russell S. Estey* and *Captain James Kevin Lovejoy* (on brief); *Colonel Robert B. Kirby, Captain Robert C. Wee, Captain Timothy P. Riley.*

For Appellee: *Captain Mark E. Frye* (argued); *Colonel Alfred F. Arquilla,*

1. Appellant was charged with the following offense:
    SPECIFICATION: THE: In that Private (E-2) Thaddeus D. Gordon, III, U.S. Army, did at Hohenecken, Federal Republic of Germany, on or about 18 June 1988, by culpable negligence, unlawfully kill Private E-2 James C. Andrews, III, by, diving off of and rocking the boat in which he, said PV2 Andrews and PFC Alfie B. Hall were passengers, causing the boat to take on water and sink.

He was found guilty of this offense:
    SPECIFICATION: THE: In that Private (E-2) Thaddeus D. Gordon, III, U.S. Army, did at Hohenecken, Federal Republic of Germany, on or about 18 June 1988, unlawfully kill Private E-2 James C. Andrews by negligence, negligently, [by] diving off of and rocking the boat in which he, said PV2 Andrews and PFC Alfie B. Hall were passengers, causing the boat to take on water and sink.

UDICE OF APPELLANT BY ALLOW-
ING COLONEL POWER TO TESTIFY.
We hold that the evidence of record was
sufficient for a rational trier of fact to find
beyond a reasonable doubt that appellant's
acts amounted to simple negligence and
constituted the proximate cause of the vic-
tim's death. *See United States v. Romero*,
1 MJ 227 (CMA 1975). *See generally Unit-
ed States v. Kick*, 7 MJ 82 (CMA 1979).
However, we hold that admission of Colo-
nel Power's sentencing testimony was prej-
udicial error. *Cf. United States v. San-
ford*, 29 MJ 413 (CMA 1990).

The evidence of record shows the follow-
ing: On June 18, 1988, appellant; Private
Alfie B. Hall; and Private James C. An-
drews rented a small rowboat at Gelters-
woog Lake, Hohenecken, Federal Republic of
Germany. These three soldiers were
friends, but appellant was a member of a
different company and brigade. Appellant
testified that he heard the victim, Private
Andrews, ask the rowboat vendor for a life
preserver, but none was available.

Once the boat was moved onto the lake,
appellant and Private Hall began diving
from the boat into the water and climbing
back into the boat. As a result, the boat
began to take on water. In a pretrial state-
ment appellant admitted Private Andrews
responded "that he could not swim." He
also admitted in another statement that the
victim was wearing a 2.5–pound weight on
each ankle during this time, which was
outside his similar colored sweat pants. At
trial, appellant testified that he did not see
these ankle weights, and the victim only
said at that time, "I'm not a swimmer."

Evidence of record also shows that the
victim indicated that he no longer wanted
to row the boat, and appellant and Private
Hall began splashing each other with wa-
ter. The boat took on more water and
began to sink. A suggestion was made to
swim to the nearby shoreline, whereupon
Private Andrews stated that he could not
swim. The boat capsized at that point. It
was factually disputed at trial whether ap-
pellant and Private Hall attempted to res-
cue Private Andrews. In any event, Pri-
vate Andrews died by drowning after being
thrown into the water. The members
found appellant guilty of unlawfully killing
Private Andrews by negligence, in violation
of Article 134.

During sentencing, defense counsel
moved to suppress any testimony on sen-
tencing by Colonel Joseph Power. He said,
in response to the judge's inquiry about
whether the defense had an issue to bring
up:

Yes, Your Honor. The defense would
move to suppress any testimony by Colo-
nel Joseph Power, the Head of the 37th
Trans Group, Special Court–Martial Con-
vening Authority. Apparently, the pros-
ecution is going to call him to testify on
the issue of general deterrence. The de-
fense feels that his testimony would be
irrelevant, not helpful to the jury, and
raise a possible specter of command in-
fluence. He knows neither the accused
nor the victim. His testimony is irrele-
vant. There's no way it can help the
jury. They understand what general de-
terrence is. Captain Morris can argue
that to them in his closing and explain it
to them.

The possible command influence is that
First Sergeant Akine or Akin of the 89th
Trans Company, who is on the panel, is
subject to, is under the command of Colo-
nel Power.

Trial counsel opposed this motion, stat-
ing:

The Government is permitted to argue
and present evidence on the issue of gen-
eral deterrence. And rather—there
should be a basis for what Captain Saun-
ders suggests will be what every mem-
ber knows about what the effect is and
the general deterrence. No one is better
able to assess that than someone who
can come to this court and state his per-
sonal knowledge about the extent to
which members of his command and
members of the—and individuals who
live on the Kaserne at which he is sta-
tioned know about this case. He'll be
able to talk about that he is the com-

mander and therefore has special court authority over the accused.

Secondly, the victim is from the same small, about one mile square Kaserne—not in his special court area, but on the same place. He'll just talk about the extent to which he's heard soldiers talk about this, that it's known to the newspaper, that his other knowledge is that it has prompted safety briefings as a result of this. There was a memorial service where many soldiers attended as a result of this. And, then, he will therefore be able to offer an opinion on—on the effect on the community, what the community can take from this, and what, if any, military application there is; in other words, in the application of care what we look for in soldiers.

That's the extent of his testimony, but it's proper for him to bring that out. The specter of command influence is non-existent, or that would bar anybody with any potential overlapping chain of command from testifying. And that was specifically addressed with First Sergeant Akine.

MJ: Does the community or has the community experienced a particular problem with this area of drownings and horse-playing in the water?

TC: It ah—It prompted action. Whether there had been others, I don't—not close in time. No, sir.

MJ: How about general deterrence though? What conduct—What are you trying to deter then? It's already the winter season.

TC: But, there's still—there is, as he'll talk about it, the same safety principle that undergirds sensible careful conduct on a boat applies to other kinds of recreational activity. It's not unique to say make sure when you go out on a boat you have a life jacket. It means when you go out to do things and fool around with your friends, you act prudently and cautiously, and you can expect from that then a similar kind of reliance on your buddies in a military setting. And, to that extent, he's able to inform the jury; which is free to give whatever weight it chooses to that testimony. But, he's not then just left out there theorizing. He's starting from a basis of personal knowledge of what these people know, and then making whatever connections they would choose to accept.

The military judge, after Colonel Power testified and left the courtroom, ruled as follows:

MJ: After hearing the testimony of the witness as limited by the Government, the court feels that the testimony would be helpful to the members in *understanding the scope of the ah—community awareness of the case in question* and the other impacts that it may have on the community, from that standpoint. As long as the Government limits its questioning to those questions asked on direct examination, the court will allow the witness to testify.

Again, the demeanor of the witness and his manner of testifying, he is not testifying on such a stereotyped full bird, 0–6, testifying to people, you know, trying to dictate their actions or anything else of this nature. He's merely relating to the court matters of concern.

So, I find nothing offensive by that after balancing the proffered testimony under 403. I feel it's admissible.

(Emphasis added.)

Colonel Power testified that he did not personally know appellant. He also indicated that appellant was one of 3,200 persons in the brigade which he commanded. Nonetheless, Colonel Power gave the following responses to trial counsel's questions:

Q: Given your assessment then of the community's knowledge of this case, what should the community take from this?

A: Well, I think that there's some important points. I think that something that needs to be understood is that each of us must be held accountable for our actions; good or bad, and that

our conduct has just got to be of a nature that incidents of this type don't happen. *I think for the soldiers, they have to feel confident that they can rely on the soldiers that they're working with and may have to fight with. If there is a crisis situation, they know that they can depend on the soldier that's next to 'em. In our profession, that's—that's paramount.*

TC: That's what this had to do, of course, with drowning on a boat on a lake, and nobody is going to be taking a boat out around here for about another nine months. What—Do you draw anything from it other than a strict lesson on how to act in a boat?

A: Yes. It just happened that it was in a boat. But, the facts of it were such that you had three people in a boat. Two could swim. One couldn't swim. Horseplay, and the soldier that couldn't swim went into the water and drowned. *And the statements that I read indicated that the other two soldiers that were there went to the side of the boat.*

    \*    \*    \*    \*    \*    \*

Q: How significant is safety to your mission?

A: Well, in the business that we're in, why safety is paramount. I've got about 800 tractors and trailers that are opening everyday. We drive about thirty million miles a year delivering cargo in Germany. When you have those big rigs out on the roads, you have to be very, very concerned with safety. We—We've got a good safety record, and I think it's reflected in the emphasis that we put on it.

(Emphasis added.)

## I

■ In *United States v. Harper*, 22 MJ 157 (CMA 1986), this Court set forth the standard for determining the legal sufficiency of evidence to support a finding of guilty. There, we stated:

> In this context, sufficient evidence generally means some legal and competent evidence from which a court-martial may find or infer beyond a reasonable doubt those facts required by law for conviction.

*Id.* at 161.

We reaffirmed our adherence to this standard in *United States v. Hart*, 25 MJ 143, 146 (CMA 1987), *cert. denied*, 488 U.S. 830, 109 S.Ct. 85, 102 L.Ed.2d 61 (1988). Relying on *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), we inquired whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The same standard is applicable in this case.

■ The record before this Court is replete with evidence from which a rational court member could find beyond a reasonable doubt that appellant's conduct constituted simple negligence. *See generally United States v. Hart, supra.* By simple negligence we mean the absence of the "degree of care [for] the safety of others which a reasonably careful person would have exercised under the same or similar circumstances." [2]

**2.** Paragraph 85, Part IV, Manual for Courts-Martial, United States, 1984, states in part regarding negligent homicide:

  a. Text. *See* paragraph 60.

  b. *Elements.*

    (1) That a certain person is dead;

    (2) That this death resulted from the act or failure to act of the accused;

    (3) That the killing by the accused was unlawful;

    (4) That the act or failure to act of the accused which caused the death amounted to simple negligence; and

    (5) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

  c. *Explanation.*

    (1) *Nature of offense.* Negligent homicide is any unlawful homicide which is the result of simple negligence. An intent to kill or injure is not required.

    (2) *Simple negligence.* Simple negligence is the absence of due care, that is, an act or omission of a person who is under a duty to use due care which exhibits a lack of that

Appellant testified that he observed Private Andrews unsuccessfully request a floatation device from the boat vendor. He also testified that he heard Private Andrews state that he was "not a swimmer." His pretrial statement went further and admitted that he heard the victim say "that he could not swim." He also stated that he observed that Private Andrews took no part in the splashing that ultimately led to the swamping of the boat. Finally, appellant obviously knew from his own swimming in the lake the approximate depth of the water. In light of these evidenced circumstances, which the members could rationally find appellant was aware of, his conduct, at the very least, could be found to be simple negligence. *See United States v. Dellarosa*, 30 MJ 255 (CMA 1990).

■ With respect to the question of proximate cause, we note that the record clearly shows that appellant rocked the boat, thereby causing it to take on water. It also established that he engaged in splashing, which caused the boat to further take on water. Finally, it shows that when the boat was near to sinking, appellant suggested the group stand up in the boat, which they did. Observers then saw the victim fall into the water on the opposite side of the boat from the other occupants. This evidence was sufficient for the members to find that appellant's conduct played a material role in Private Andrew's drowning. *United States v. Romero*, 1 MJ 227 (CMA 1975); *see United States v. Lingenfelter*, 30 MJ 302 (CMA 1990); *United States v. Cooke*, 18 MJ 152 (CMA 1984).

■ We have held that homicide by simple negligence is an offense under Article 134 of the Uniform Code of Military Justice. *See United States v. Kick, supra; United States v. Spicer*, 20 MJ 188 (CMA) (summary disposition), *cert. denied*, 474 U.S. 924, 106 S.Ct. 259, 88 L.Ed.2d 265 (1985); *United States v. Cozart*, 22 MJ 113 (CMA 1986) (summary disposition). Contrary to the implication of the defense's

degree of care of the safety of others which a reasonably careful person would have exercised under the same or similar circum-

brief, the broad scope of the decision of the Supreme Court in *Solorio v. United States*, 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987), does not alter our holding in this regard. Accordingly, we conclude that the members of this court-martial properly found appellant guilty of this offense as a matter of law.

II

Appellant's second complaint is that the testimony of Colonel Power, his brigade commander, was improperly introduced by the prosecution against him on sentencing. *See generally United States v. Antonitis*, 29 MJ 217 (CMA 1989). Essentially this senior officer opined that appellant's offense of negligent homicide undermined his soldiers' confidence in each other and compromised his transportation unit's "paramount" concern for safety. RCM 1001(b)(4), Manual for Courts–Martial, United States, 1984. *See generally United States v. Fontenot*, 29 MJ 244, 251 (CMA 1989). He further stated that this offense was well known in the command and was exacerbated by its occurrence just after "our drown proofing classes." Appellant contends that there was no "reasonable linkage" between his crime and the mission of his command (*see United States v. Witt*, 21 MJ 637 (ACMR 1985), *pet. denied*, 22 MJ 347 (1986)), and the commander's testimony constituted improper command influence (*see United States v. Sanford*, 29 MJ 413, 415 (CMA 1989)).

■ RCM 1001(b)(4) states:

(4) *Evidence in aggravation.* The trial counsel may present evidence as to *any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty.* Except in capital cases a written or oral deposition taken in accordance with R.C.M. 702 is admissible in aggravation.

stances. Simple negligence is a lesser degree of carelessness than culpable negligence. *See* paragraph 44c(2)(a).

Discussion

Evidence in aggravation may include evidence of financial, social, psychological, and medical impact on or cost to any person or entity who was the victim of an offense committed by the accused and *evidence of significant adverse impact on the mission, discipline, or efficiency of the command directly and immediately resulting from the accused's offense.*

*See also* R.C.M. 1004 concerning aggravating circumstances in capital cases.

(Emphasis added.)

The standard for admission of evidence under this rule is not the mere relevance of the purported aggravating circumstance to the offense. *See* Mil.R.Evid. 401 and 402. Instead a higher standard is required, namely, the aggravating circumstances proffered must directly relate to or result from the accused's offense.

■ With this more demanding standard in mind, we turn to the challenged testimony of Colonel Power. His initial opinion was that appellant's offense had an adverse impact on his soldiers' confidence in one another. However, we note that in the present case, appellant was found guilty of only negligent acts of commission. He negligently dove off the boat and rocked the boat, thereby causing it to take on water and sink. The particulars of this offense involved no finding that appellant omitted or failed to help Private Andrews once the boat sank and his peril was realized. In fact the evidence was heavily disputed on this point. Accordingly, this portion of Colonel Power's testimony was inadmissible under RCM 1001(b)(4) because it did not directly relate to or result *from the offense of which the accused has been found guilty.*

■ An additional aspect of Colonel Power's testimony was his opinion that appellant's offense undermined his command's paramount concern for safety. Clearly appellant's offense involved negligent acts as noted above. However, these negligent acts did not occur in the course of his command's transportation duties but during an off-duty boating frolic of three soldiers, two of whom were not even in Colonel Power's brigade. The requirement of RCM 1001(b)(4) that the adverse impact on the unit *directly relate to or result from* the accused's offense was also not satisfied in this case.

■ Finally, appellant's command-influence argument is not without substance. The military judge's ruling on the defense motion suggests that "community awareness" of a soldier's offense is a proper concern under RCM 1001(b)(4). We seriously doubt, however, that the President intended this provision to authorize a more severe punishment depending on the degree of publicity in the command which the offense received. Moreover, the judge's acquiescence to the "lesson format" in which the prosecution chose to present the challenged testimony of Colonel Power was clearly unacceptable. Surely this senior officer was not authorized to lecture or appear to lecture the members of the court-martial on the lessons to be drawn from appellant's crime. *See generally* Art. 37, UCMJ, 10 USC § 837.

■ The maximum punishment in this case was a bad-conduct discharge, 1 year's confinement, total forfeitures, and reduction to E–1. Para. 85e, Part IV, Manual, *supra.* The members awarded appellant a bad-conduct discharge, 6 months' confinement, partial forfeitures, and reduction to E–1. In addition, substantial mitigating evidence was presented by the defense, including his potential for future military service and his age of 20. Finally, trial counsel capitalized on Colonel Power's testimony in his closing argument. In view of the above, we cannot conclude that appellant was not prejudiced. *See United States v. Antonitis, supra* at 220; *cf. United States v. Sanford, supra* at 415.

The decision of the United States Army Court of Military Review is reversed as to sentence. The record of trial is returned to the Judge Advocate General of the Army for remand to that court for reassessment of the sentence.

Chief Judge EVERETT and Judge COX concur.