**UNITED STATES**

**v.**

**Richard A. HOLLINGSWORTH, Chief Health Services Technician, U.S. Coast Guard.**

**CGCMG 0103.
Docket No. 1057.**

U.S. Coast Guard Court
of Criminal Appeals.

19 July 1996.

Trial Counsel: LCDR Robert M. Wilkins, USCG.

Assistant Trial Counsel: LT Melissa Bert, USCG.

Defense Counsel: CPT Laurel A. Woods, USMC.

Assistant Defense Counsel: LT Blair C. Smith, JAGC, USNR.

Appellate Defense Counsel: LCDR Allen Lotz, USCG.

Appellate Government Counsel: LT Frank R. Levi, USCGR.

Before Panel Two, BAUM, FEARNOW, and O'HARA, Appellate Military Judges.

O'HARA, Judge:

Appellant was tried by a general court-martial before a military judge sitting without members. Pursuant to his pleas of guilty, entered in accordance with a pretrial agreement, he was convicted of the following offenses: two specifications of dereliction of duty, three specifications of violating a general order, one specification of sodomy, one specification of extortion, two specifications of assault consummated by battery, one specification of adultery and one specification of committing an indecent act on a child, in violation of Articles 92, 125, 127, 128, and 134 of the Uniform Code of Military Justice (UCMJ), 10 USC §§ 892, 925, 927, 928, and 934, respectively. The judge sentenced appellant to a dishonorable discharge, confinement for forty-two months, forfeiture of all pay and allowances, and reduction to pay grade E–1. The convening authority approved the sentence as adjudged. Before this Court, Appellant has assigned six errors, which have been briefed by both sides [1] and orally argued before us.

Appellant initially suggested in his brief that the promulgating order issued by the convening authority is erroneous in that it reflects charges which were withdrawn before trial. It is true Rule for Courts–Martial (RCM) 1114(c)(1) only requires that "the charges and specifications, or a summary thereof, on which the accused was arraigned" be reflected in the order, but the Rule does not appear to be exclusive. The addition of the withdrawn specifications to the promulgating order, although surplusage, does explain what otherwise would appear to be gaps in the charges. Such additional, helpful and accurate information need not be eliminated, requiring a new promulgating order.

## SENTENCING EVIDENCE

In three assignments, the appellant argues that evidentiary errors were committed in the sentencing phase of his court-martial. Both Assignment II on uncharged similar misconduct and Assignment IV on the effect of a trial on a victim's recovery urge that the evidence was improper aggravation under RCM 1001(b)(4). Assignment III contends that the applicability of 10 USC § 1408(h) spousal benefits to appellant's family situation was not a relevant sentencing consideration.

### Evidence in Aggravation

As succinctly stated by Judge Cox:

An appropriate analysis of proffered government evidence on sentencing is first to determine if the evidence tends to prove or disprove the existence of a fact or facts permitted by the sentencing rules [citation omitted]. If the answer is yes, then is the proffered evidence admissible under either the Military Rules of Evidence [ (MREs) ] or the more relaxed rules for sentencing.

*U.S. v. Martin,* 20 M.J. 227, 230 n. 5 (C.M.A. 1985); *U.S. v. Lynott,* 28 M.J. 918, 919 (C.G.C.M.R.1989) (paraphrasing *Martin* ). RCM 1001(b)(4) allows the trial counsel to "present evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty."

The phrase "directly relating to or resulting from the offenses" imposes a "higher standard" than "mere relevance." *United States v. Gordon,* 31 M.J. 30, 36 (C.M.A. 1990). . . . Evidence qualifying for admis-

---

1. Motions contained in the briefs of the parties not previously granted are hereby granted.

sion under RCM 1001(b)(4) must also pass the test of Mil.R.Evid. 403 . . . ; *see United States v. Wilson,* 35 M.J. 473, 476 n. 5 (C.M.A.1992). A "military judge has wide discretion" in applying Mil.R.Evid. 403. *United States v. Yanke,* 23 M.J. 144, 145 (C.M.A.1987).

*U.S. v. Rust,* 41 M.J. 472, 478 (C.M.A.1995).

## Uncharged Similar Misconduct

The appellant was originally charged with two specifications of indecent acts upon his eldest daughter, who was under sixteen years of age at the time, in violation of Article 134, UCMJ. The first specification alleged that the appellant placed his hand on his daughter's breasts in May 1993. The second specification involved the appellant's fondling and placing his hands on his daughter's clitoris and vagina in June 1993. As part of the pretrial agreement, the appellant pled guilty only to the second specification, with some exceptions and substitutions, such that he only admitted to placing his hands on his daughter's vagina during the period of April through May 1993. AE XXXIII at p. 5 & 6 and R. 16. During the plea inquiry, the appellant admitted that he accomplished the indecent act under the guise of doing a medical examination which he further admitted that he was unqualified to do. R. 47. Following the judge's acceptance of appellant's pleas, the government withdrew the first indecent-act specification, as well as other charges to which the defendant had pled not guilty per the pretrial agreement. R. 55–56 & 63–64.[2] The government then during the sentencing phase of the trial introduced as evidence in aggravation under RCM 1001(b)(4), over defense objection, the daughter's testimony on the May 1993 incident which was the subject of the withdrawn specification.[3] After the government's proffer that the earlier act was also done under the pretense of a medical examination, the military judge admitted the evidence based upon the logic of *U.S. v. Mullens,* 29 M.J. 398 (C.M.A.1990), and that the evidence was more probative than prejudicial. R. 174–75.

 Uncharged misconduct is not ipso facto inadmissible as evidence in aggravation. *U.S. v. Silva,* 21 M.J. 336 (C.M.A.1986). It can be considered, subject to MRE 403, so long as it is relevant to the sentencing—in this instance, "any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty" under RCM 1001(b)(4). The challenged breast-touching misconduct occurred before the vagina-touching offense to which the appellant pled guilty. Thus, the breast touching cannot be said to be indicative of aggravation "resulting from" the vagina touching.[4] Therefore, to be admissible, the uncharged misconduct in question must "directly relate to" the charged indecent act. First, there is no question here that the extrinsic misconduct actually occurred.[5]

---

**2.** Actually, the pretrial agreement, AE XXXIII, was silent about what was to be done with the charges and specifications to which the accused pled not guilty. However, during the plea inquiry, the parties did not disagree with the judge's understanding that they would be withdrawn and they were, in fact, withdrawn.

**3.** Unlike *U.S. v. Green,* 44 M.J. 631, 637 (C.G.Ct. Crim.App.1996) (O'Hara, J., concurring), there is no room in this case to argue that the pretrial agreement precluded using "no-longer-charged misconduct" during the sentencing phase. The government made it very clear to the defense before the trial and before the signing of the pretrial agreement that it intended to introduce uncharged misconduct, even indecent acts in the charges that may be withdrawn as part of a plea agreement. AE XL. Nothing in the subsequent pretrial agreement suggests that the parties came to a different understanding. In this case, there was no surprise "backdooring".

**4.** E.g., *U.S. v. Rust,* 41 M.J. 472, 478 (1995) (the three deaths' connection was too indirect to defendant doctor's dereliction); *U.S. v. Scott,* 42 M.J. 457 (1995) (evidence of the death and injuries giving rise to the dismissed voluntary-manslaughter and assault charges was admissible aggravation because it directly related to or resulted from the conviction for carrying a concealed weapon); *U.S. v. Vickers,* 13 M.J. 403 (C.M.A.1982) (the accused's disobedience of the order to leave the area of the disturbance actually exacerbated the incident); *U.S. v. Witt,* 21 M.J. 637 (A.C.M.R.1985) (proper aggravation evidence that a soldier, shortly after ingesting LSD purchased from the accused, assaulted several other soldiers with a knife).

**5.** Compare *U.S. v. Zengel,* 32 M.J. 642 (C.G.C.M.R.1991) (report of civil arrest in the service record insufficient); *U.S. v. Williams,* 28 M.J. 911 (A.C.M.R.1989) (letter counseling the accused for indecent assault inadequate).

This is also not clearly a case where "the misconduct is so unrelated to the offense charged as to be irrelevant." *U.S. v. Bono*, 26 M.J. 240, 242 (C.M.A.1988) (the crimes recited in the confession had no bearing on the offenses of which the appellant was convicted).[6] Additionally, the breast-touching misconduct does not demonstrate the impact of the vagina-touching offense on the victim or the command.[7] Nor was it part and parcel of the commission of the specific indecent act of touching the victim's vagina.[8] Even so, RCM 1001(b)(4)'s "directly relating to" requirement does not mean that the sentencing authority must treat crimes as isolated incidents in a vacuum.[9] This is particularly so where the charged offense is part of a course of conduct in which the charged and uncharged misconduct are so interrelated as to be deemed one in the same. *U.S. v. Shupe*, 36 M.J. 431 (C.M.A.1993) (5 additional drug transactions were part of an extensive and continuing scheme to introduce and sell LSD to numerous buyers assigned to the naval base and was proper aggravation because it showed the continuous nature of the charged misconduct and its full impact on the military community); *U.S. v. Ross*, 34 M.J. 183 (C.M.A.1992) (altering of a total of 20–30 military aptitude tests, rather than the 4 alterations for which he was actually found guilty, within the same time period and at the same place was relevant aggravation); *U.S. v. Lynott*, 28 M.J. 918 (C.G.C.M.R.1989) (aggravation evidence concerning the defendant's drug dealings directly related to his crimes of cocaine distribution and use). In

6. Also compare *U.S. v. Zakaria*, 38 M.J. 280 (C.M.A.1993) (sexual perversion not relevant to the theft offenses); *U.S. v. Gordon*, 31 M.J. 30 (C.M.A.1990) (negligent acts of commission did not suggest a failure to render assistance so that it could be said there was an adverse impact on soldiers' confidence in one another); *U.S. v. Wingart*, 27 M.J. 128 (C.M.A.1988) (other sexual misconduct not relevant to the charged sex offenses); *U.S. v. Green*, 44 M.J. 631 (C.G.Ct.Crim.App. 1996) (O'Hara, J., concurring) (no admissible evidence linking the illegal drug use to the charged theft offense); *U.S. v. Clabon*, 33 M.J. 904 (A.F.C.M.R.1991) (the subsequent car chase and denial of being a military member did not shed any light on the circumstances of the assault and battery for which the defendant was found guilty); *U.S. v. Moore*, 29 M.J. 819 (A.C.M.R.1989) (numerous indecent acts and rapes of another female up until 8 years before the present sexual misconduct trial not admissible aggravation); *U.S. v. Berger*, 23 M.J. 612 (A.F.C.M.R.1986) (same with a 6–year hiatus between the alleged acts committed on another female and the acts charged).

7. Compare *U.S. v. Wilson*, 35 M.J. 473 (C.M.A. 1992) (family's frantic search for their daughter and their distress at the time of the commission of the charged indecent act and carnal knowledge involving their daughter was proper aggravation), and *U.S. v. Shupe*, 36 M.J. 431 (C.M.A. 1993) (additional drug transactions, which were part of an extensive scheme to introduce and sell LSD on the naval base, was proper aggravation because it showed the full impact on the military community).

8. Compare *U.S. v. Jones*, 44 M.J. 103 (1996) (that the accused was HIV positive and failed to inform his partner of such was proper aggravation for an adultery conviction); *U.S. v. Irwin*, 42 M.J. 479 (C.M.A.1995) (defendant's statements regarding threats to the victim, made after he broke into her home and before he raped her, were admissible aggravation); *U.S. v. Glazier*, 26 M.J. 268 (C.M.A.1988) (proper aggravation with the misappropriated vehicle offense that it was used for a joy ride during which the accused and another member consumed alcoholic beverages and a fatal accident ensued); *U.S. v. Yanke*, 23 M.J. 144 (C.M.A.1987) (black and white photo taken of the victim after death was proper aggravation of the circumstances surrounding the death, showing the infant's struggle against the defendant); *U.S. v. Silva*, 21 M.J. 336 (C.M.A. 1986) (during the charged acts, the accused told his young female victims that he had done the same acts with other young girls, apparently to convince the girls that the acts were proper and, thus, prevent their reporting of them, proper aggravation); *U.S. v. Lynott*, 28 M.J. 918 (C.G.C.M.R.1989) (appropriate aggravation evidence concerning the defendant's drug dealings directly related to his crimes of cocaine distribution and use); *U.S. v. Ringuette*, 29 M.J. 527 (A.F.C.M.R.1989) (statements of the defendant, during or immediately following the commission of the charged offenses, stating his motive for the offenses and threatening to kill the victim if she reported the offenses to the police, admissible aggravation).

9. There have been varying views on the required nexus between the uncharged misconduct and the charged offense to permit its consideration as aggravation. E.g., compare *U.S. v. Ciulla*, 32 M.J. 186, 188 (C.M.A.1991) (Everett, S.J., concurring in part and dissenting in part) ("Quite simply, I believe that evidence of uncharged misconduct is not admissible in aggravation—no matter how similar it might be to the charged offenses—unless it literally directly relates to or results from the charged offenses."), with *U.S. v. Ross*, 34 M.J. 183 (C.M.A.1992).

this case, the military judge placed particular reliance on *U.S. v. Mullens,* 29 M.J. 398 (C.M.A.1990). The *Mullens* uncharged misconduct involved identical acts with the same children at an earlier time and at a different duty station. This was found to be proper aggravation relating to the charged acts as a continuous course of conduct involving the same or similar crimes, the same victims, and a similar situs within the military community, i.e., the service member's home. While the uncharged and charged misconduct in this case involve the same crime with the same victim at the same location during the same month [10], the appellant only pled guilty to a single act, rather than an established course of conduct. However, the Court in *U.S. v. Shupe, supra,* found that the defendant's attempt to narrow his drug distribution conspiracy to only one transaction did not preclude the government from showing the true extent of the scheme with evidence of other transactions. In this case, it was the same misconduct, both involving the fondling of his eldest daughter in their home, both using the same subterfuge of a medical examination because he was a corpsman, and both occurring in very close proximity in time. Under these circumstances, we cannot say that the military judge abused her discretion in treating the breast-touching misconduct as part of the same sexual abuse of his daughter, whose

probative value as sentencing evidence in aggravation outweighed the potential for unfair prejudice under MRE 403's balancing test [11]. Assignment II is, therefore, rejected.

### Victim–Impact Evidence

■ The government called as an expert witness, Dr. Bild–Libbin, a child psychologist who was treating the appellant's eldest daughter. The doctor testified about the daughter's prognosis. She opined that the patient would need a significant amount of therapy over a long period of time, and despite two years of therapy, there was only limited progress. On cross-examination, the defense elicited testimony that not all of the daughter's psychological problems may have been attributable to appellant's sexual abuse.[12] The defense's questioning also raised a point about whether the daughter's prognosis would have been farther along with better or different treatment. When the government explored this point on redirect, the doctor volunteered, without defense objection, that one of the things that can hinder a patient's progress is an abused child's inability to put the incident behind them when they continue to face testifying about it in a legal proceeding. R. 202–203. In Assignment IV, the appellant argues that this testimony was plain error.

---

**10.** The accused could not remember exactly when the vagina touching took place, other than it was sometime in April or May 1993, and that is what he stipulated to. R. 47 & PE 1. His daughter testified that the breast touching took place in May. R. 175. She further testified with respect to the vagina touching:

> ATC: And when was this?
> WIT: This was in—
> ATC: Was this also that summer?
> WIT: This was in the summer of 93—
> ATC: Is this after your, I'm sorry.
> WIT: This is after he had touched my breast.

R. 178. That was the extent of the daughter's testimony on when the vagina touching took place. She also testified about discovering, that same summer, pictures revealing her father's adulterous affair (R. 179–180) and thereafter calling her mother to tell her about it (R. 181). The mother testified that she got that call on July 8, 1993. R. 156. From the testimony as a whole, it is apparent that the vagina touching preceded the daughter's telephone call to her mother. Considering the appellant's stipulation of fact that the vagina touching was in April or

May and the daughter's recollection of the breast touching occurring in May before the vagina touching, we conclude that the vagina touching also took place in May.

**11.** Compare *U.S. v. Zakaria,* 38 M.J. 280, 283 (C.M.A.1993) ("[I]t is difficult to imagine more damaging sentencing evidence to a soon-to-be sentenced thief than also branding him as a sexual deviant or molester of teenage girls."); *U.S. v. Kinman,* 25 M.J. 99 (C.M.A.1987) ("The Court of Military Review held that, because the uncharged allegations [of sexual misconduct] were 'so repugnant' and 'so much more reprehensible than the acts charged that the danger the accused would be sentenced for the acts not charged was overwhelming.'"); *U.S. v. Zengel,* 32 M.J. 642 (C.G.C.M.R.1991) (civil arrest for arson in a one-specification drug-use case); *U.S. v. Hall,* 29 M.J. 786 (A.C.M.R.1989) (the uncharged drug offenses were more aggravated than the charged drug offenses).

**12.** The doctor's testimony also raised a question whether the sexual abuse or the adultery had the greater affect on the daughter.

The decision in *U.S. v. Wilson,* 35 M.J. 473 (C.M.A.1992), recognized that RCM 1001(b)(4) allows "victim-impact" evidence, which includes a crime's effect on the family and the close community.

Evidence is admissible on sentence which shows "the specific harm caused by the defendant." *Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991). Nevertheless, an accused is not "responsible for a never-ending chain of causes and effects." *United States v. Witt,* 21 M.J. 637, 640 n. 3 (A.C.M.R.1985), *pet. denied,* 22 M.J. 347 (C.M.A.1986).

*U.S. v. Rust,* 41 M.J. 472, 478 (1995). From the doctor's testimony, it is clear that there were psychological repercussions for appellant's daughter in the wake of appellant's offenses; they were not remote causes and effects. The government's presentation was properly on the daughter's psychological state at the time of trial, including the likelihood of recovery. The defense appropriately focused on how much of the daughter's problems could be attributable to causes, other than the appellant's offenses, such as preexisting conditions and inadequate treatment. The fact that the pendency of legal proceedings can be a factor in the recovery rate for sexual abuse cases came out as a fuller explanation of the daughter's prognosis. It put the daughter's present psychological state in proper context. Rather than being adverse to the appellant, it was neutral, if not favorable to him. While he may have been responsible for some of his daughter's psychological problems, her slow recovery was in part due to factors beyond his control, particularly the resolution of the pending criminal charges against him. Therefore, we disagree that, once factors affecting recovery rate were raised by the defense, it was error, much less plain error, to recognize that the pendency of legal proceedings is one of the things which may affect crime victims' recovery. For this reason, we consider Assignment IV to be meritless.

### 10 USC § 1408(h) Spousal Benefits

■ Also during the sentencing proceeding, the government presented the judge with a copy of 10 USC 1408(h) as Prosecution Exhibit 6. This provision makes a spouse or former spouse of a servicemember eligible to receive some of the retirement benefits the member could have received but for the loss of retirement due to misconduct involving abuse of the spouse or dependent child. The defense questioned its relevancy and argued that it was only appropriate in rebuttal if the defendant put in question the potential financial impact of his court-martial on his family. Notwithstanding the defense objection, raised here as Assignment III, the military judge admitted the statutory extract into evidence, although she recognized that what she was really doing was taking judicial notice of the law. Her rationale was that it "fit within one of those things I believe that is properly something you would tell the [court] members in order for them to understand the meaning of the various kinds of sentence components they can adjudge." R. 72. The government did not incorporate the statute in its sentencing argument, but the accused made reference to it in his unsworn statement: "I am glad that they [my family] will receive a portion of what would have been my retired pay, regardless of my final disposition." R. 213.

■ We do not believe that it was error for the military judge to be aware of this provision which provides some relief for victims of spouse and child abuse by servicemembers who may lose their retirement benefits because of such crimes. "[M]ilitary judges are presumed to know the law and to act according to it." *U.S. v. Prevatte,* 40 M.J. 396, 398 (C.M.A.1994). Military judges have a general awareness of the collateral consequences of court-martial sentences. The law does not require them to forget during sentencing what they already know— only that it not improperly cloud their determination of an appropriate sentence for a particular accused under the specific facts of the case, even though there may be a potential for collateral administrative consequences because of the sentence. There is no indication in this case that the military judge gave undue weight to this collateral administrative consequence in her sentencing decision. Therefore, we consider Assignment III to also be without merit.

## CONVENING AUTHORITY'S FAILURE TO CONSIDER CLEMENCY MATTERS

Appellant was represented at his court-martial by two counsel, both from the Naval Legal Service Office (NLSO) Mid–Atlantic, Norfolk, Virginia. At the end of his trial, the appellant requested that his copy of the record of trial and the staff judge advocate's (SJA's) advice to the convening authority under RCM 1106 be delivered to his trial defense counsel. R. 227. By letter dated 29 September 1995, the SJA for the convening authority in Miami, Florida, forwarded the record of trial and his advice to the defense counsel's command, the NLSO in Virginia. The SJA's letter stated that, according to appellant's assistant defense counsel (ADC), the trial defense counsel was then temporarily assigned to the USS WASP which was deployed and not scheduled to return for five months. Because of this, the ADC had indicated that she was going to ascertain whether the appellant wanted her to handle the post-trial matters instead.

The ADC replied to the SJA by letter dated 12 October. She advised that the appellant still wanted the record and advice served on the defense counsel, which the ADC would forward. Because of the USS WASP's deployment in the Mediterranean, the ADC, without being specific about the amount of time, also requested an extension be granted to allow the defense counsel to submit a clemency package. And even though a copy of the certificate of service dated 5 October was signed and returned by the ADC, she posited that only the defense counsel's signature on the original certificate, which she was forwarding to the defense counsel with the record and advice, would be effective for RCM 1106 purposes.[13]

In a follow-up letter to the NLSO dated 20 October, the SJA acknowledged that the ADC had contacted his office about forwarding the material to the deployed defense counsel. The SJA advised that he still had not received the certificate of service. He also requested to be advised on how and when the material was mailed to the defense counsel, and he further requested assistance in keeping the process on track. By another letter to the NLSO, dated 9 November, the SJA confirmed a telephone conversation between his staff and a senior member at the NLSO. The SJA acknowledged that his staff had been advised earlier by the ADC that she had mailed the record and advice to the defense counsel on 16 October. The SJA also appreciated the NLSO's offer at that point to contact the defense counsel directly to determine the status of things.

■ On 16 November, the SJA sent a message to the USS WASP (info the NLSO et al.), requesting that it be passed to the defense counsel. The message synopsized the SJA's earlier correspondence and asserted that the time period for the submission of RCM 1105 material had expired without a submission or request for an extension by the trial defense counsel. That notwithstanding, the message stated that the defense counsel had until 30 November to submit RCM 1105 matters because the SJA intended to submit his advice and a draft RCM 1107 action to the convening authority on 1 December. Still not hearing from the defense counsel, the SJA remained true to his word, and the convening authority took action on the record of trial on 1 December. The record was then forwarded for further review by letter dated 8 December which advised that trial defense counsel had still not submitted any matters under RCM 1105. Such material was finally faxed to the convening authority on 15 December. Other than the ADC's reply to the SJA's initial 29

---

13. There was some incongruity in the ADC's 12 October request for an extension while at the same time insisting that service on the trial defense counsel was still required. Until there has been service on the accused or counsel, the time clock under RCMs 1105(c) and 1106(f) does not begin to run. Either service on the ADC was sufficient, making an extension request timely, or service had not yet been perfected, rendering any extension request premature. In any case, the request was not acted upon by the convening authority or the SJA. If it had, it would have been insufficient in light of the fact that it took more than thirty days for the record of trial to get to the trial defense counsel. And, Article 60(b)(2), UCMJ, appears to only contemplate an extension of the normal 10 days for not more than 20 additional days, for a total of only 30 days.

September letter, this fax was the only other written response of record to any of the SJA's post-trial correspondence. By letter dated 18 December, appellant's clemency material was forwarded by the SJA, without further consideration because of the late submission, for inclusion in the record of trial. In Assignment I, appellant urges that it was error for the convening authority to act without his clemency material.

In his brief on appeal, appellant provided an affidavit from his trial defense counsel in which she was somewhat taken aback by the convening authority having taken action before receiving the clemency matters in light of the requests for extensions of time to do so. She referred to the ADC's request for an extension prior to 17 November, apparently the one contained in the 12 October letter. See footnote 13, *supra*. She advised that she did not receive the record of trial until 15 November and noted there was no receipt in the package (even though the ADC made it a point in her reply to the SJA that she was forwarding the original certificate of service with the record). The defense counsel maintained that trial counsel at the time of the court-martial knew that she was going to deploy aboard the USS WASP for six months shortly after the conclusion of the trial and that she was the one who the appellant requested on the record to receive the record and advice, not the ADC. She, therefore, expressed some irritation about the failure of the post-trial correspondence, except the 16 November message, to be addressed directly to her. She said that she drafted up a message reply on 17 November, advising of the receipt of the record and her disagreement that the submission period had expired and further requesting a 20–day extension, in addition to the normal 10 days, based upon her receipt of the record on 15 November. However, she had to depart the USS WASP for another ship before the message was sent. An advance copy of her draft message (which does not include a message heading with addressees), as faxed to the NLSO, was included in appellant's initial brief, and indi-

cated that she was being temporarily transferred to the USS WHIDBEY ISLAND until 22 December. But, she actually ended up on the USS SHREVEPORT. Upon her return to the USS WASP, she requested a hard copy of the message but was advised that copies were only maintained for thirty days. And, the administrative staff member who handled the message had died aboard ship before she could talk to him. Even so, she rationalized that, even if her message was ineffective, in the absence of any indication of record at that time that she had actually been served, ADC's indefinite request for an extension remained in effect (although not acted upon by the convening authority or the SJA), and therefore, the convening authority should have waited in light of the defense's expressed intention to submit clemency matters.

Notwithstanding the marvels of modern communications, "[w]hat we have here is a failure to communicate." [14] Neither the government nor the defense in this case were making every reasonable effort to effectively communicate with one another. However, the government's efforts were better than the defense's in that it was at least endeavoring to develop an ongoing dialogue, but with little success at eliciting formal responses from the defense. It was not as clear as the defense counsel maintains in her affidavit that post-trial matters were. definitely to go to her, notwithstanding her deployment, and that the government understood that. The initial correspondence between the SJA and the ADC suggests that things were more open to question as to who and how the defense would handle the post-trial functions in light of defense counsel's deployment. It is unclear to us whether the SJA's staff was provided with adequate information on how to contact the defense counsel directly or whether the NLSO normally acted as a clearinghouse for its deployed counsel. It is unclear whether the ADC or the NLSO defense staff could have been more active as intermediaries with the communications difficulties

---

**14.** The actor, Strother Martin, immortalized this line playing an ice-hearted, chain-gang boss in the movie, "Cool Hand Luke" (1967). Maltin ed., Leonard Maltin's Movie Encyclopedia 574– 75 (1994). Frank R. Pierson wrote the screenplay for the movie. Kaplan ed., Bartlett's Familiar Quotations 755 (16th ed. 1992).

being encountered between the government and the deployed defense counsel. It is unclear why the SJA waited until 16 November to send a message directly to the defense counsel aboard ship. While the defense counsel did communicate by fax with the NLSO, it is unclear why this capability was not used in dealing with the SJA's office. It is unclear why the ADC did not simply fax a copy of the SJA's 3–page advice to the defense counsel since the record of trial was not necessary for the clemency submission, particularly in light of the fact that it took over a month for the record of trial to get to the ship. It is unclear whether a month's delay is normal in getting records of trial to deployed counsel. It is unclear how the defense counsel expected to be advised of the decision on her extension request or anything else when she did not update her message to the convening authority as to which ship she was actually transferred to. In light of the ADC's position that actual service on the defense counsel was required for RCM 1106 purposes, it is unclear what indications the SJA had that the record of trial had, indeed, gotten to the defense counsel.[15] Be that as it may, it is clear to us that the defense counsel did, in fact, receive the record and the SJA's advice and was afforded, as required by RCMs 1105(c)(1) and 1106(f)(5), ten days in which to make a submission. She neither made a submission nor obtained an extension to do so within the allotted time.[16] She had no basis to assume that her extension request was received by the convening authority, and even less, that it had been approved. Therefore, appellant's right to make a submission to the convening authority before his case was acted on was waived. RCMs 1105(d)(1) & 1106(f)(6). In the final analysis, the defense counsel faulted the SJA for not ensuring that the post-trial correspondence, in particular the record of trial and the SJA's advice, was received by her, but by the same token, she acted as if there was no correlative duty on her part to make sure her communications actually reached the convening authority. We think that the defense counsel is being inconsistent in this regard. It is incumbent upon all parties, including the defense, to effectively communicate so that post-trial functions can be carried out in an orderly and timely manner. Assignment I is rejected.

## OTHER ASSIGNMENTS

In Assignment V, appellant argues that his sentence is inappropriately severe.

---

**15.** In *U.S. v. Haire*, 40 M.J. 530 (C.G.C.M.R. 1994), and *U.S. v. Leaver*, 40 M.J. 529 (C.G.C.M.R.1993), we have demanded evidence of post-trial service upon the defense. Unlike the record before us, the SJA did not have the benefit of the defense counsel's affidavit in which she confirmed that she had received the record and advice by 15 November. The defense counsel in her affidavit also stated that the NLSO defense staff had advised the trial counsel that their service of the record on her did not occur until 15 November. If the SJA was aware of this, he would have been on more solid footing in his 16 November demand for defense submissions no later than 30 November. However, the SJA's actions do not appear to be based on knowledge of the defense counsel's actual receipt of the record on a date certain. The SJA apparently relied upon the ADC's initial receipt, coupled with her assurances that she would forward the materials to the defense counsel, and the subsequent passage of time as demonstrating its receipt by the defense counsel. If the defense position is correct, the SJA was taking a chance in light of our precedents. However, because of the defense counsel's actual receipt of the record and advice, we need not decide under what circumstances, if any, service upon other defense counsel or the defense counsel's command may suffice for purposes of setting the time period under RCMs 1105(c) and 1106(f) in motion. Moreover, we are not saying, as the defense has suggested before us, that the government can never act without concrete proof of personal service on the defense. Otherwise, the defense could grant itself an extension simply by not returning the certificate of service.

**16.** The defense has argued that the convening authority should not have acted until 15 December, the date the clemency package was received by fax. This is based upon the normal 10 days afforded for defense submissions, plus 20 more days for an extension, for a total of 30 days from 15 November when trial defense counsel received the record and advice. The argument falters because no extension was granted in this case. It could only work if extensions of time were somehow deemed matters of right, solely within an accused's prerogative, which may be exercised without notice to the government. Besides creating an unworkable procedure, Article 60(b)(2), UCMJ, and RCMs 1105(c)(1) and 1106(f)(5) vest the discretion to grant extensions for good cause with the convening authority, not the defense.

Appellant was facing at trial a maximum sentence of a dishonorable discharge, forfeiture of all pay and allowances, reduction to E–1, and confinement for twenty-three years and six months; he received only forty-two months of confinement (six months less than the cap in the pretrial agreement, AE XXXIV). We note that appellant's offenses involved abusing his position as a father and parent, abusing his position as a corpsman and patient care provider, and abusing his position as a Chief Petty Officer and senior leader in the Coast Guard. Therefore, we are unable to conclude from the record that the sentence is inappropriately severe for this appellant and these crimes. Finally, appellant's last assignment on the propriety of the appointment of civilian judges to this Court has been resolved against him by *U.S. v. Ryder,* 44 M.J. 9 (1996).

## CONCLUSION

As a result of the foregoing analyses, we find appellant's assignments of error to be without merit. Pursuant to Article 66, UCMJ, we have determined that the findings and sentence are correct in law and fact. Accordingly, the findings of guilty and sentence as approved below are affirmed.

Chief Judge BAUM and Judge FEARNOW concur.