# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**No. ACM 39567**

_____

**UNITED STATES**
*Appellee*

**v.**

**Christopher A. DUNLAP**
Major (O-4), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 4 May 2020

_____

*Military Judge:* Jennifer E. Powell.

*Approved sentence:* Dismissal, confinement for 90 days, and a reprimand. Sentence adjudged 28 June 2018 by GCM convened at Joint Base McGuire-Dix-Lakehurst, New Jersey.

*For Appellant:* Lieutenant Colonel Anthony D. Ortiz, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Zachary T. West, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Judge KEY delivered the opinion of the court, in which Chief Judge J. JOHNSON and Judge POSCH joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

KEY, Judge:

A military judge sitting as a general court-martial convicted Appellant, in accordance with his pleas pursuant to a pretrial agreement (PTA), of three specifications of willfully disobeying a superior commissioned officer and one specification each of fraternization and adultery, in violation of Articles 90 and

134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 890, 934.[1] The military judge sentenced Appellant to a dismissal, confinement for three months, and a reprimand. Consistent with the terms of the PTA, the convening authority approved only 90 days of confinement but approved the remainder of the adjudged sentence.

On appeal, Appellant raises two issues through counsel: (1) whether the military judge erred by permitting Appellant's wife to exceed the permissible bounds of an unsworn victim-impact statement and (2) whether testimony about Appellant's relationship with his children was proper aggravation evidence. Appellant personally raises one additional issue pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982): whether he was improperly placed in pretrial confinement. We have carefully considered the issue Appellant raises regarding his pretrial confinement and determine it is without merit and warrants no discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

We find the military judge erred in admitting evidence in aggravation and in the victim's unsworn statement. However, we conclude these errors did not affect Appellant's sentence. Finding no error materially prejudicial to Appellant's substantial rights, we affirm the findings and sentence.

## I. BACKGROUND

Appellant, a married major, carried on an intimate relationship with an enlisted co-worker, Airman First Class (A1C) AJ, over a period of several months.[2] Appellant and A1C AJ continued their relationship despite orders from their commander to cease contact with each other, and they were reassigned to other duties due to their relationship becoming a distraction to their office. During this time, Appellant and his wife, Ms. AD, separated and shortly thereafter divorce proceedings were initiated. After violating the commander's orders and generally indicating he did not intend to follow them in the future, Appellant was placed in pretrial confinement, where he remained through his trial. Appellant continued violating the no-contact order by having periodic telephone conversations with A1C AJ while he was in pretrial confinement.

---

[1] Except as otherwise noted, all references in this opinion to the Uniform Code of Military Justice (UCMJ), the Rules for Courts-Martial (R.C.M.), and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*).

[2] Airman First Class (A1C) AJ had been a senior airman, but she was reduced in grade. We use A1C as her grade in this opinion.

Early in Appellant's trial, the military judge asked trial counsel to note for the record who had been identified "as an Article 6b victim." Trial counsel named Appellant's wife, Ms. AD, and no one else.

The Government's sentencing case consisted of evidence in aggravation including testimony from Appellant's commander, one of Appellant's co-workers, and his first sergeant, Master Sergeant (MSgt) JW. Over defense objection, the military judge permitted MSgt JW to testify about how Appellant would not avail himself of MSgt JW's offers to facilitate telephone conversations between Appellant and his children while Appellant was in pretrial confinement. Trial counsel's argument for the admissibility of this evidence was that "given the aggravating nature of the crimes in general, including adultery, under [R.C.M.] 1001(b)(4), getting into the circumstances surrounding his pretrial confinement and his actions and statements during that time demonstrate the aggravating nature of the situation. Adultery is one of the offenses." In allowing this testimony, the military judge did not place a Mil. R. Evid. 403 analysis on the record.

At the conclusion of the Government's sentencing case, trial counsel told the military judge that Ms. AD would like to give an unsworn statement. Before Ms. AD began, however, trial defense counsel objected to portions of the written unsworn statement, which had been marked as Court Exhibit 1. The military judge sustained the Defense's objection to portions of the statement which addressed: Appellant's and Ms. AD's efforts to have a fifth child before they separated; the impact of Appellant's and Ms. AD's separation on their four children; Appellant's lack of involvement with the children since the separation; and his lack of interest in his fifth child, whom Ms. AD was pregnant with at the time of trial. The military judge overruled defense objections to portions addressing: Appellant's reaction to learning that Ms. AD was pregnant with their fifth child;[3] Ms. AD moving to her parents' house with the four children; and her financial challenges in providing for the children since the separation. The military judge permitted some commentary in the unsworn statement about the children's reaction to having little contact with their father.[4] In ruling that the excluded information pertaining to Appellant's lack of involvement with and the impact on his children was improper victim-impact material, the

---

[3] Ms. AD said she and Appellant had been trying to have a fifth child, and when she told Appellant she was pregnant, he said the blood-test results were fake and that she needed to take another pregnancy test in front of him. She also said Appellant told her the pregnancy "upset and hurt [A1C AJ] because [A1C AJ] wanted to have a baby."

[4] The military judge permitted Ms. AD to say Appellant had "skipped out on soccer games with the kids" and "he didn't just do this to me. He did this to our children. And he didn't just hurt me, he's hurt our children. He's abandoned us plain and simple."

military judge explained she found it "unclear" whether these impacts related to the offense of adultery, or if they were "arising from the broken marriage." She also noted the court had not received any notice of designation of Article 6b representatives for the children.

Trial counsel then requested the military judge reconsider her ruling blocking the following language in the unsworn statement about Appellant's lack of interest in his fifth child: "He has asked only once my entire pregnancy how our baby is. When I asked him if he wanted to be involved in naming our child he said, 'Do whatever you want. Get rid of it. I don't care what you do with it.'" The military judge reversed her earlier ruling and allowed this language to remain in Ms. AD's unsworn statement. She added that "the victim impact statement is not evidence. Therefore [the Mil. R. Evid.] 403 balancing test does not apply," but that even if the balancing test applies to matters submitted under R.C.M. 1001A, "I would have conducted a [Mil. R. Evid.] 403 balancing test, and in doing so, I would find that the [probative] value is not substantially outweighed by the unfair prejudice." The military judge did not identify what the probative value of this information was.

The military judge next asked Court Exhibit 1—Ms. AD's original proposed statement—to be marked as Appellate Exhibit IV, and the updated unsworn to be made a new Court Exhibit 1. Afterwards, Ms. AD gave her unsworn statement verbally to the court, largely detailing the impacts Appellant's affair had on her marriage to him and the struggles she was enduring as a result of her separation from him.

The Defense's sentencing case consisted of documentary and photographic evidence—for which the Defense obtained the military judge's relaxation of the rules of evidence under R.C.M. 1001(c)(3)—and Appellant's written and verbal unsworn statements, the latter of which was delivered in a question-and-answer format led by trial defense counsel. In his verbal unsworn presentation, Appellant said he had never told Ms. AD "get rid of it," based on his personal opposition to abortion, although he did acknowledge "saying something along the lines of I don't care or whatever name you choose is up to you." Appellant also apologized to a number of people, including his children, saying in part,

> So I would apologize to my kids that I wasn't a better husband in the family. But I would also want them to know that I've never been a bad father, that I loved them from the second that they were born. . . . But I've always been there for them. I will always be there for them.
>
> . . . I just want them to know that I never abandoned them. I never did. I can't be with them right now for a lot of reasons.

Among the pictures introduced by Appellant are images of him playing with his smiling children. One caption associated with the pictures reads, "I love my children very much. I never wanted my children to suffer because of my actions. My biggest regret is that my children haven't seen or heard from their father in over a month. I never wanted them to hurt."

After the Defense rested, trial counsel sought to admit portions of Ms. AD's unsworn statement that the military judge had previously disallowed, arguing they rebutted Appellant's assertion that he had "always been there" for his children. Trial counsel then told the military judge, "So I don't have a way to present that to you at this time and I'll take your advisement as to how to present that if it's proper rebuttal."

Over Defense objection, the military judge permitted trial counsel to use some, but not all, of the requested portions of Ms. AD's unsworn statement as rebuttal. She specifically permitted the additional following four sentences: (1) "My children struggle to cope with or understand the little contact they have with their father. He doesn't call for months at a time. When he does he starts the call with 'I can't talk long;'" and (2) "He doesn't ask for updates on the children's schooling."

The following colloquy then appears in the trial transcript:

> ATC [assistant trial counsel]: So, your Honor, at the next opportunity, we'll introduce Court Exhibit 1 with those changes made to it and then still have the first original offered—
>
> MJ [military judge]: Why don't you,—
>
> TC [trial counsel]: —document.
>
> MJ: —it may be easier, just offer it 'cause I'd like to make it clear for the record what was offered as, as the—
>
> TC: Court Exhibit 1.
>
> MJ: —Court Exhibit 1. So let—well, there's a couple ways we can handle it. We can either mark it as Court Exhibit 2 or if you want to offer it as a Prosecution Exhibit. I don't think the marking is really going to matter because really the Rules of Evidence are relaxed. I just think it's important to mark for the Appellate record.
>
> TC: Yes, your Honor. I think we'll mark it as Prosecution Exhibit 19? Prosecution Exhibit 19.

Prosecution exhibit 19 was admitted into evidence.

The next day, after the military judge announced the sentence, trial counsel indicated they had made the changes to Prosecution Exhibit 19. The military

judge asked, "Defense counsel, did you have an opportunity to review this in relationship to my ruling? Do you have any objections to this?" Trial defense counsel replied, "Yes, your Honor. No objections." Trial counsel then provided the military judge and the court reporter Appellate Exhibit IV and Court Exhibit 1, which the military judge described as the "edited version" of Ms. AD's unsworn statement.

No court exhibits were included in the record of trial we received, and none are listed in the record's table of contents. Ms. AD's written unsworn statement, however, is included as Prosecution Exhibit 19.

## II. LAW

In the Government's sentencing case in aggravation, trial counsel may introduce evidence of "aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty." R.C.M. 1001(b)(4). Such evidence in aggravation may include "evidence of financial, social, psychological, and medical impact on or cost to any person . . . who was the victim of an offense committed by the accused . . . ." *Id.* In order to admit such evidence in aggravation, R.C.M. 1001 requires a showing of "the specific harm caused by the [accused]," which is a higher standard than a showing of "mere relevance." *United States v. Rust*, 41 M.J. 472, 478 (C.A.A.F. 1995) (citations omitted). Not every consequence of an accused's actions is admissible in sentencing, as an accused may not be held responsible for "a never-ending chain of causes and effects." *Id.* (citation omitted).[5] The rule does "not authorize the introduction of general evidence of . . . uncharged misconduct." *United States v. Hardison*, 64 M.J. 279, 281 (C.A.A.F. 2007) (quoting *United States v. Nourse*, 55 M.J. 229, 231 (C.A.A.F. 2001)). In determining whether evidence admitted in aggravation is "directly related" to the offenses which an appellant was convicted of, we assess whether the evidence is both direct and "closely related in time, type, and/or often outcome, to the convicted crime." *Id.* at 281–82. Even when evidence qualifies for admission under R.C.M. 1001(b)(4), its probative value must still be weighed against its prejudicial impact under Mil. R. Evid. 403. *Id.* at 281 (citation omitted).

Article 6b, UCMJ, grants victims of offenses under the UCMJ the right to be reasonably heard at sentencing hearings related to such offenses. 10 U.S.C. § 806b(a)(4)(B). A victim covered by this right is one "who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense under [the UCMJ]." 10 U.S.C. § 806b(b).

---

[5] *See also United States v. Stapp*, 60 M.J. 795, 800 (A. Ct. Crim. App. 2004), *aff'd on other grounds*, 64 M.J. 179 (C.A.A.F. 2006).

Under R.C.M. 1001A, victims in non-capital cases may exercise their right to be heard through sworn or unsworn statements. R.C.M. 1001A(b)(4)(B). Unsworn statements may be oral, written, or both. R.C.M. 1001A(e). Victims who are under 18 years of age may make an unsworn statement either personally or through a designee appointed under R.C.M. 801(a)(6). *Id.* Statements offered under R.C.M. 1001A "may include victim impact or matters in mitigation," and should neither exceed those topics nor recommend a specific sentence. R.C.M. 1001A(c); R.C.M. 1001A(e), Discussion. Similar to the definition under R.C.M. 1001, victim impact under R.C.M. 1001A means "any financial, social, psychological, or medical impact on the victim directly relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001A(b)(2).

"The rights afforded by Article 6b, UCMJ, and R.C.M. 1001A belong to victims, not the Government, and trial counsel may not appropriate the rights of a victim in order to admit Government evidence in its aggravation case." *United States v. Shoup*, 79 M.J. 668, 671 (A.F. Ct. Crim. App. 2019) (citing *United States v. Hamilton*, 78 M.J. 335, 342 (C.A.A.F. 2019)). Victim unsworn statements are not government exhibits and are not to be admitted as such. *See, e.g.*, *Hamilton*, 78 M.J. at 337, 341; *United States v. Jones*, ARMY 20180189, 2019 CCA LEXIS 450, at *5 (A. Ct. Crim. App. 6 Nov. 2019) (unpub. op.).

An accused being sentenced by court-martial is entitled to make an unsworn statement "in extenuation, in mitigation or to rebut matters presented by the prosecution, or for all three purposes . . . ." R.C.M. 1001(c)(2)(A). Although the accused may not be cross-examined upon his unsworn statement, the prosecution may "rebut any statements of facts therein." R.C.M. 1001(c)(2)(C). "It is well settled that the function of rebuttal evidence is to explain, repel, counteract or disprove the evidence introduced by the opposing party." *United States v. Banks*, 36 M.J. 150, 167 (C.A.A.F. 1992) (citations omitted). The "scope of rebuttal is defined by evidence introduced by the other party." *United States v. Saferite*, 59 M.J. 270, 274 (C.A.A.F. 2004) (citation omitted).

The Military Rules of Evidence apply during sentencing proceedings. *Id.* at 273 (citation omitted). Military judges are permitted to relax the rules of evidence with respect to defense matters in extenuation or mitigation and "may include admitting letters, affidavits, certificates of military and civil officers, and other writings of similar authenticity and reliability." R.C.M. 1001(c)(3); Mil. R. Evid. 1101(b). When these rules are so relaxed, they may also be relaxed "to the same degree" for evidence offered by the Government in rebuttal. R.C.M. 1001(d). This relaxation "goes more to the question of whether the evidence is authentic and reliable," and does not convert otherwise inadmissible

evidence to admissible evidence. *Saferite*, 59 M.J. at 273 (quoting *United States v. Boone*, 49 M.J. 187, 198 n.14 (C.A.A.F. 1998) (internal quotation marks omitted)).

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Hutchins*, 78 M.J. 437, 444 (C.A.A.F. 2019) (citations omitted). Military judges abuse their discretion when their "factual findings are clearly erroneous, view of law is erroneous, or decision is outside the range of reasonable choices." *Id.* (citations omitted). In applying the Mil. R. Evid. 403 balancing test, military judges enjoy "wide discretion." *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (citations omitted). However, we give less deference to military judges' decisions if they do not explain their analysis on the record, and we give military judges no deference when they fail to conduct the analysis at all. *Id.* (citations omitted).

In the absence of an objection at trial, we review claims of erroneous admission of evidence for plain error, which is established when: (1) there is error; (2) which was plain, clear, or obvious, and (3) the error resulted in material prejudice to Appellant's substantial rights. *Hardison*, 64 M.J. at 281 (citations omitted). When evidence is improperly admitted during sentencing proceedings, "the test for prejudice is whether the error substantially influenced the adjudged sentence." *United States v. Barker*, 77 M.J. 377, 384 (C.A.A.F. 2018) (citation and internal quotation marks omitted). This is determined by evaluating the relative strength of the parties' cases along with the materiality and quality of the evidence in question. *Id.* (citation omitted). "An error is more likely to be prejudicial if the fact was not already obvious from the other evidence presented at trial and would have provided new ammunition against an appellant." *Id.* (citation omitted).

## III. ANALYSIS

Ms. AD's unsworn statement was originally entered as a court exhibit under R.C.M. 1001A, but it morphed wholesale into a prosecution exhibit in the Government's aggravation case with little explanation or rationale. This was error, as was the military judge's ruling permitting testimony by MSgt JW about Appellant's lack of communication with his children.

### A. Ms. AD as a Victim under Article 6b, UCMJ, and R.C.M. 1001A

The first question raised by Ms. AD's unsworn statement is whether or not she was properly identified as a victim in the first place under R.C.M. 1001A; that is, whether a spouse is considered a victim of the UCMJ offense of adultery. We were unable to locate any definitive statement of law on this point, making this an issue of first impression for us.

Many years ago, our superior court, the United States Court of Military Appeals (now the United States Court of Appeals for the Armed Forces (CAAF)), concluded adultery was a "violation of the marital bonds," but not a crime against the spouse, at least with respect to the marital privilege then in existence. *United States v. Rener*, 37 C.M.R. 329, 332 (C.M.A. 1967) (quoting *United States v. Massey*, 35 C.M.R. 246, 254 (C.M.A. 1965)). This holding led to a change to the *Manual for Courts-Martial, United States* (1969 rev. ed.) (1969 *MCM*), explicitly stating that adultery *was* an offense that would pierce the marital privilege, although the 1969 *MCM* at the time was more of a "treatise" than the set of evidentiary rules modern practitioners are familiar with today. *United States v. Taylor*, 64 M.J. 416, 419 (C.A.A.F. 2007). The marital privilege became part of the Military Rules of Evidence when Mil. R. Evid. 504, marital privilege, was adopted in 1980. The 1984 *MCM* included the new Mil. R. Evid. 504 and deleted the 1969 *MCM*'s discussion about the privilege, to include the references to adultery. *See* Mil. R. Evid. 504, *Manual for Courts-Martial, United States* (1984 ed.) (1984 *MCM*). The analysis of Mil. R. Evid. 504 in the 1984 *MCM* (and subsequent versions of the *MCM*), however, indicated Mil. R. Evid. 504 was "similar" to the 1969 *MCM*'s provisions on the privilege. *Id.* at 420; *see also* 1984 *MCM*, App. A22, at A22–31. This led the CAAF to conclude in *Taylor* that adultery is a "crime against the person or property" of the spouse for purposes of piercing the Mil. R. Evid. 504 marital privilege, because there is no evidence the President intended to abandon the discussion in the 1969 *MCM,* even though that discussion had been long deleted. 64 M.J. at 420.

The offense of adultery in the *MCM* at the time of Appellant's conduct[6] generally requires a direct impact of the offense on the military. *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 62.(c).(2). Unlike most offenses in the *MCM*, the adultery provision contains a substantial discussion as to what should be considered in determining whether an act of adultery is a crime under the UCMJ. Factors listed to assess whether adulterous acts are prejudicial to good order and discipline or are service discrediting—and thereby criminal offenses—include such considerations as effects on organization morale, teamwork, and efficiency; whether government time and resources were misused to facilitate the conduct; whether the conduct was flagrant or in violation of orders to desist; and whether the parties involved were legally separated. *Id.* Largely absent from this list is any reference to impacts of the offense on spouses or other family members. The military status of the

---

[6] The adultery offense occurred between on or about 1 November 2017 and on or about 9 March 2018. The offense has since been redesignated as "extramarital sexual conduct." *See Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*), pt. IV, ¶ 99.

spouse of the accused adulterer is listed as one factor, but only insofar as the adulterous relationship impacts the spouse's ability to perform his or her military duties. *Id.* at ¶ 62.(c).(2)(d).

Reading the *MCM*'s text on the adultery offense, one could conclude that adultery is a crime in which the military is the victim, not the spouse. Moreover, the CAAF's ruling in *Taylor* did not explicitly overrule the holding of *Rener* that adultery is not a crime against the spouse; rather, the CAAF held the addition of adultery to the list of offenses which would pierce the marital privilege in the 1969 *MCM* (and the later *MCM* analyses citing approvingly of the 1969 provision) essentially superseded *Rener*'s common law analysis. *See Taylor*, 64 M.J. at 420 (no evidence that by adopting Mil. R. Evid. 504 the President meant to jettison adultery exception listed in 1969 *MCM*). As such, *Taylor* can be read to say less about who is or is not a victim of the offense of adultery and more about how the analysis contained in the 1984 *MCM* and later *MCM*s can be evidence of the drafters' intent and breathe life back into deleted text.

Since *Taylor* was decided, Article 6b was added to the UCMJ, giving victims the right to be heard in certain portions of the military justice process, to include sentencing proceedings, a right implemented by R.C.M. 1001A. Both Article 6b and R.C.M. 1001A define covered victims as those who have "suffered direct physical, emotional, or pecuniary harm," thereby calling for a clear nexus between the accused's offenses and the harm suffered in order to conclude a person is a "victim" under the rule. Although adultery in the UCMJ is focused on the impacts the offense has on the military, rather than the impacts on a non-military spouse, we conclude the non-offending spouse may be a victim under Article 6b and R.C.M. 1001A depending on the facts of a given case. We note that despite her overall dissent in *Taylor*, Judge Ryan concluded that adultery is "an anti-marital offense," an assessment she said "is intuitive and a matter of common sense." *Taylor*, 64 M.J. at 420 (Ryan, J., dissenting).

In the instant case, Ms. AD outlined the emotional impact Appellant's sexual relations with A1C AJ had on her, in no small part because Appellant insisted on telling Ms. AD about his sexual conduct with A1C AJ, to include the fact they had sex in Ms. AD's bed. She detailed her shock and frustration at knowing her husband of more than ten years was having an intimate relationship with one of his enlisted co-workers along with the toll that knowledge took on her mental well-being. The emotional harm suffered by Ms. AD is directly related to and proximately caused by the adultery Appellant committed with A1C AJ. Although we do not reach the determination that non-offending spouses are *per se* victims of adulterous conduct, we conclude under the facts presented here that Ms. AD qualifies as a victim under Article 6b, UCMJ, and R.C.M. 1001A.

**B. The Scope of Ms. AD's Unsworn Statement**

R.C.M. 1001(b)(4) limits evidence in aggravation to aggravating circumstances "directly relating to or resulting from the offenses of which the accused has been found guilty." R.C.M. 1001A similarly only permits presentation of information "directly relating to or arising from" the offenses in question from a person who has suffered a "direct" harm. Considering the similarity of these two rules and the explicit requirement for a "direct" connection between the offense and the harm, we conclude the rule permitting victim-impact testimony, like the one permitting aggravation evidence, does not serve to open the door to "a never-ending chain of causes and effects." *See Rust*, 41 M.J. at 478. Having determined Ms. AD is a victim who is entitled to provide an unsworn statement to the court, the next question is the proper scope of that statement.

As given at trial, Ms. AD's unsworn statement focused primarily on the impacts of the dissolution of her marriage, and the military judge permitted her—over defense objection—to discuss Appellant's negative reaction to finding out she was pregnant with their fifth child, her moving to her parents' house, and the financial challenges she was experiencing in providing for the children. The military judge also permitted Ms. AD to discuss Appellant's lack of interest in Ms. AD's pregnancy and soon-to-be-born child.

In his providency inquiry, Appellant told the military judge he engaged in sexual intercourse with A1C AJ in November 2017, then again in December 2017, and that they "had an ongoing sexual relationship from that time through March of 2018." Ms. AD moved out on 23 December 2017. During his unsworn statement, Appellant explained how he had been feeling increasingly distanced from Ms. AD well before his affair with A1C AJ. Although these matters were presented in an unsworn format, they highlight the difficulties in drawing a straight line between the incidents of adultery and the dissolution of the marriage, as the military judge in this case recognized when she found it "unclear" whether certain issues raised by Ms. AD were caused by the adultery or "the broken marriage" and concluded the latter was not proper victim-impact information which must be excluded from Ms. AD's statement. We are similarly concerned about importing the wide array of frustrations and adversity often associated with divorce proceedings into the specifically defined concept of victim impact for particular offenses under the UCMJ.

The relevant offense here, as relied upon by the Government at trial, is adultery, which is rooted in extramarital sexual intercourse. Such conduct can plainly be the impetus for separation and divorce; however, we cannot say divorce necessarily follows instances of adultery. We likewise cannot say that when a marriage dissolves after adulterous conduct that the two are causally connected. In some cases, adultery may very well be the sole cause for marriage to end. But, it is also entirely possible that adulterous conduct occurs alongside

a marriage failing for other reasons.[7] As explained above, a permissible victim-impact statement under R.C.M. 1001A is that which addresses matters "directly relating to or arising from" the offenses Appellant has been convicted of, and the court must find that direct connection before accepting the information contained in such a statement.

In this case, the relevant conduct Appellant was convicted of pertains to him engaging in sexual intercourse with A1C AJ, a woman who was not his wife, while he was married to Ms. AD. We find the psychological harm done to Ms. AD by virtue of learning of Appellant's misconduct is directly related to the offense of adultery. Ms. AD's feelings of anger and disgust, as expressed in her unsworn statement, are predictable and natural consequences of Appellant's adulterous conduct and proper for a victim-impact statement. The connection between Appellant's adultery and his physical separation from Ms. AD is less direct, but it is no large leap to conclude the adultery in this case was at least a substantial contributing factor—if not the cause—of that separation. Our assessment is buttressed by Appellant's own testimony that his sexual relationship with A1C AJ became "ongoing" in December, which was at the same time Ms. AD moved out of the house. Thus, we conclude matters in Ms. AD's unsworn statement detailing the circumstances surrounding her and Appellant's decision to separate, to include moving to her parents' house and the financial challenges she faced as a result, are appropriate victim-impact topics under R.C.M. 1001A, and the military judge correctly overruled the defense objection to these matters.

Beyond the separation itself, the topics the military judge allowed Ms. AD to raise became increasingly less connected to the offense of adultery. We cannot conclude that Appellant's reaction to learning Ms. AD was pregnant with their fifth child was directly relating to or arising from Appellant's adulterous conduct. Appellant's inflammatory conduct seems more directly tied to his lack of desire to continue his marriage to Ms. AD, his frustration with the prospect of bringing a new child into a dissolving household, and his irregular manner of handling his personal affairs. Information about Appellant's lack of interest in Ms. AD's pregnancy and in being involved with naming his fifth child is only marginally related to his commission of the offense of adultery. R.C.M. 1001A, however, requires more than a marginal relationship between offense and impact—it requires the impact directly relate to or arise from the offense. We readily recognize the significant pain and frustration Appellant's indifference

---

[7] Notably, in the 2019 *MCM*, a legal separation is an affirmative defense to extramarital sexual conduct, the successor to the adultery offense. 2019 *MCM*, pt. IV, ¶ 99.c.(4). In the 2016 *MCM*, legal separation is one factor to consider in determining whether adulterous conduct violates the terminal element of Article 134, UCMJ, 10 U.S.C. § 934. *MCM*, pt. IV, ¶ 62.c.(2)(h).

towards his unborn child caused Ms. AD, but such indifference has not been shown to directly relate to or arise from Appellant's sexual intercourse with A1C AJ. R.C.M. 1001A is not a vehicle to put every transgression by a convicted accused before a sentencing authority; rather, it allows the victim to be heard with respect to victim impact which has a direct nexus to the offenses for which the accused has been convicted. This consideration is especially relevant in the context of ongoing divorce proceedings, often replete with raw emotions and sharp grievances. By permitting Ms. AD's statement to address topics not directly relating to or arising from Appellant's adultery offenses, beyond what is authorized by R.C.M. 1001A, the military judge abused her discretion.

We further agree with Appellant that his children were not victims under Article 6b and R.C.M. 1001A. The children were not identified as victims during trial, and the record does not indicate they were designated any representatives under R.C.M. 801(a)(6). Considering our conclusion that a spouse is not a *per se* victim of adultery, we find it unlikely that young children of a marriage would qualify as victims of adultery under Article 6b and R.C.M. 1001A absent some unusual factual predicate not present here. R.C.M. 1001A does not expressly permit one victim to provide a statement about the impact on another victim, and we read the rule to limit victim statements to the impact on the victim giving the statement.[8] That being said, one victim may very well vicariously or secondarily be subjected to harm caused to another victim such that the first victim could validly identify their own psychological injury as a result. Indeed, a parent responsible for the safety and well-being of children and who witnesses the suffering of those children may be harmed as much as, if not more than, the children themselves. The injury, however, must still directly relate to or arise from the offenses of which Appellant was convicted. In this case, however, the impacts on the children largely arose from Appellant's figurative and literal absence from their lives, and not from Appellant's adulterous sexual conduct with A1C AJ.

The military judge excluded most of the portions of Ms. AD's unsworn statement discussing the impacts on the children, but she permitted Ms. AD to comment on Appellant missing soccer games and her view that he had hurt the children and abandoned the family. Appellant did not object to this language at trial and has forfeited this error as a result, and we review for plain error. As explained above, not every hardship imposed by Appellant on his family can be attributed to his adultery. We see no evidence that Appellant ceased to be involved in his children's lives because of his sexual misconduct. Rather, he seems to have made the lamentable (but not criminal) decision to become an

---

[8] We recognize there may be cases in which one victim is designated to exercise another victim's rights, which may result in a different outcome.

absent parent to his children, commentary about which should have been excluded from Ms. AD's unsworn statement. It was plain error to allow this information to remain in Ms. AD's unsworn statement, especially in light of the vigorous debate about similar comments in other portions of the statement. We analyze whether Appellant suffered prejudice from this error below.

## C. Ms. AD's Statement as Rebuttal Evidence

At the close of the Defense's case, the military judge permitted trial counsel to admit as rebuttal evidence four sentences from Ms. AD's unsworn statement impugning Appellant's involvement in his children's lives. This was a proper subject of rebuttal, as Appellant had just attempted to give the military judge the impression that he was a caring and responsible father. Appellant said in his unsworn statement, "I've always been there for them. I will always be there for them. . . . I just want them to know that I never abandoned them. I never did." Appellant further introduced pictures of his children, both with and without him in the frames, and added captions professing his love for and commitment to them.

Appellant's devotion—or lack thereof—to his children was not a relevant issue in his trial until he made it one in his unsworn statement in an effort to receive a reduced sentence. Because Appellant tried to portray himself as a caring and supportive father, the Government was permitted to show that he was not, or at least not as caring and supportive as he claimed. *See, e.g.*, *Manns*, 54 M.J. at 166.

Because the rules of evidence had been relaxed at this point, the Government did not have to meet typical evidentiary requirements of authenticity and reliability. As the Defense submitted several signed but unsworn letters from friends and former co-workers of Appellant, the Government could have offered similar documents in rebuttal. Instead, Ms. AD's entire unsworn statement was admitted into evidence as a prosecution exhibit, including the additional four sentences. Contrary to the military judge's perspective that it was not "really going to matter," once the exhibit became a prosecution exhibit it was no longer an unsworn victim-impact statement—it was transformed into evidence in the Government's rebuttal case. While the Government was permitted to rebut statements of fact contained in Appellant's unsworn statement, the scope of that rebuttal was constrained by the scope of the factual assertions in Appellant's unsworn statement, which Ms. AD's statement far eclipsed. Rather

than a tailored rebuttal, the Government offered, and the military judge admitted, a wide-ranging unsworn statement from Ms. AD as a prosecution exhibit upon the suggestion of the military judge.[9]

As explained above, R.C.M. 1001A permits a victim to provide information to the court-martial about the impacts they have suffered as a result of an accused's offenses. The admission of Ms. AD's entire unsworn statement as a prosecution exhibit, ostensibly in rebuttal to a single point from Appellant's own unsworn statement, was plain error and an abuse of the military judge's discretion.

**D. MSgt JW's Testimony**

During the Government's sentencing case, and prior to Ms. AD giving her unsworn statement, MSgt JW testified—over defense objection—that he had encouraged Appellant to talk to his children and offered to facilitate phone calls between him and his children, but Appellant would decline, saying that "this'll all be over soon" and the children would "find out some day the truth of all this." This evidence was admitted prior to Appellant's unsworn statement. Trial counsel's circular argument that Appellant's statements "demonstrate the aggravating nature of the situation" due to the "aggravating nature of the crimes," of which adultery is one, does not make a convincing case for admission of this evidence.[10] Rather, the evidence, at its most outer edges, goes to whether or not Appellant is a devoted father—an irrelevant issue at the stage of the trial in which it came in. An alternative reading of this evidence is that

---

[9] Although trial defense counsel objected to the evidence offered in rebuttal, they did not object when Prosecution Exhibit 19 was admitted into evidence. After the sentence was announced, the military judge asked the Defense whether they had any objections to the exhibit, and trial defense counsel answered in the negative. Under Mil. R. Evid. 103(b), parties need not renew objections after a military judge has ruled "definitively on the record admitting or excluding evidence" in order to preserve a claim of error for appeal. By only objecting to the evidence offered in rebuttal and not the entire exhibit, Appellant has forfeited the issue in the absence of plain error. *See United States v. Eslinger*, 70 M.J. 193, 197–98 (C.A.A.F. 2011). Even though Appellant arguably waived the issue by stating no objection after both the exhibit had been admitted and the sentence had been announced, we exercise our authority under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to address this error. *See United States v. Chin*, 75 M.J. 220, 222–23 (C.A.A.F. 2016).

[10] The Government's argument on appeal, that Appellant's statement was evidence he was "trivializing his confinement and alluding to some 'truth' his children would someday learn" which was evidence of his "attitude toward his adultery offense," is similarly uncompelling.

Appellant may have wished to avoid having conversations with his young children while he was in jail awaiting trial on charges of sexual and professional indiscretions.

Regardless, the probative value of Appellant's decisions about whether or how much to talk to his children was non-existent. The elicitation of this evidence was seemingly designed to demonstrate not the aggravating circumstances or victim impact of Appellant's offenses, but instead to paint Appellant as a poor father. Because the evidence lacked probative value, it served only as a waste of time and distraction, irrelevantly suggesting Appellant did not care about his small children. Because the military judge did not place an analysis under Mil. R. Evid. 403 on the record, we give her ruling no deference and conclude her admission of this evidence was an abuse of her discretion.

**E. Prejudice to Appellant**

Having determined the military judge erred in admitting both Ms. AD's unsworn statement and portions of MSgt JW's testimony as prosecution evidence, as well as permitting Ms. AD to discuss Appellant's reaction to and lack of interest in her pregnancy with their fifth child, we must assess the impact of these errors on Appellant's sentence by determining whether the errors "substantially influenced the adjudged sentence." *Barker*, 77 M.J. at 384 (citation omitted).

Appellant was charged with and pleaded guilty to significant offenses. His adulterous fraternization with a junior Airman in the same office not only drew the attention of co-workers, but resulted in both Appellant and the Airman being removed from their positions. Moreover, he persisted in his misconduct even after being ordered into pretrial confinement. Despite the severity of these offenses, the Government's case in aggravation veered into tangential aspects of Appellant's marriage and his relationship with his children.

To be sure, Appellant invited a degree of this distraction by seeking to portray himself as a devoted father to the military judge. In doing so, he opened the door to the Government rebutting that portrayal. While MSgt JW's testimony about Appellant's lack of interaction with his children should not have been permitted in the Government's sentencing case in chief, the testimony would have been admissible in rebuttal as long as Appellant made factual assertions to the contrary during the Defense's case. The problem with this construct, however, is that we have no way of knowing whether Appellant would have sought to portray himself as a devoted father in his sentencing case had MSgt JW's testimony been correctly disallowed. That is, we do not know if Appellant's unsworn statement and sentencing exhibits on these points were designed to counteract MSgt JW's testimony that Appellant was disinterested in

talking to his children. The wholesale admission of Ms. AD's unsworn statement as a prosecution exhibit only served to compound the error, potentially raising the question of how much of Appellant's sentence was attributed to Appellant's interactions with his family as opposed to his actual offenses under the UCMJ. Trial counsel's sentencing argument largely focused on the military aspects of Appellant's offenses, but they also argued to the military judge in support of their sentencing recommendation for 180 days of confinement: "But that's him being a good father. He says he's a good father, but he doesn't care if his fifth baby is named."[11]

In spite of these errors, Appellant's offenses were significant, both in terms of impropriety and the impact they had on his unit. One of the greatest aggravating factors is Appellant's repeated refusal to follow his commander's orders, even after being placed in pretrial confinement—strong evidence of low rehabilitative potential. We conclude the errors in this case were harmless, especially in light of comments by the military judge who was also the sentencing authority. The military judge's view that there was little or no significance to Ms. AD's unsworn statement being made a prosecution exhibit versus a court exhibit indicates she did not give the statement any greater weight, and instead gave Ms. AD's statement the weight it was due. The military judge also explicitly highlighted the distinction between the injury caused by Appellant's offenses and the injury caused by the disintegration of his marriage to Ms. AD. "Military judges are presumed to know the law and to follow it absent clear evidence to the contrary." *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007) (citing *United States v. Mason*, 45 M.J. 483, 484 (C.A.A.F. 1997)). Despite erroneously admitting portions of MSgt JW's testimony and portions of Ms. AD's unsworn statement, in addition to allowing Ms. AD's unsworn statement to be admitted as a prosecution exhibit, we are convinced the military judge gave the evidence the appropriate weight and Appellant's sentence was not substantially influenced by these errors.

## IV. CONCLUSION

The approved findings and the sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

---

[11] Trial counsel also recommended Appellant be sentenced to a dismissal and to forfeit all pay and allowances.

Accordingly, the approved findings and sentence, as modified, are **AF-FIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court